# United States Court of Appeals
## For the First Circuit

No. 09-2628

UNITED STATES,

Appellee,

v.

WILLIE DANCY,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Lynch, Chief Judge,
Souter, Associate Justice,[*]
and Stahl, Circuit Judge.

Charles W. Rankin, with whom Michelle Menken and Rankin & Sultan were on brief, for appellant.
Cynthia A. Young, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

April 13, 2011

---

[*]    The Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**LYNCH**, **Chief Judge**. Willie Dancy, convicted of being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1), and sentenced to fifteen years (180 months) of imprisonment under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e), brings serious challenges to both his conviction and his sentence.

As to his conviction, Dancy argues that the firearm and related evidence should have been suppressed, that other evidence was inadmissible and prejudicial, that he was entitled to a mistrial based on the government's closing argument, and that the jury instruction on what constitutes a "firearm" was in error and violated the Second Amendment.

As to his sentence, Dancy argues the district court erred in finding him to be an armed career criminal under the ACCA, as recommended in the Presentence Report (PSR), and sentencing him to fifteen years' imprisonment, the statutory minimum under the ACCA. Based on the Supreme Court's decisions under the ACCA in Begay v. United States, 553 U.S. 137 (2008), and Johnson v. United States, 130 S. Ct. 1265 (2010), and on our recent decision in United States v. Holloway, 630 F.3d 252 (1st Cir. 2011), he argues we should change prior circuit law. He argues that his prior state convictions for assault and battery on a police officer (ABPO) and for assault and battery with a dangerous weapon (ABDW) could have been based on merely reckless actions, that this is the dispositive consideration under the ACCA, and that the district court erred in

-2-

finding these were valid predicate offenses rendering him an armed career criminal.

We affirm both the conviction and the sentence.

## I. BACKGROUND

### A. The Gun Possession Crime

We summarize the facts as found by the district court in its denial of Dancy's motion to suppress, United States v. Dancy, No. 04-CR-10387, 2007 WL 2789279 (D. Mass. Sept. 25, 2007), which are consistent with record support and are not clearly erroneous. See United States v. Dubose, 579 F.3d 117, 120 (1st Cir. 2009). We supplement that description with testimony from the record. Dancy does not argue that any of the district court's basic factual findings were clearly erroneous.

The investigating officers testified at the suppression hearing as follows. On December 8, 2004, just after 9 PM, Brockton Police Detective Mark Reardon, driving in an unmarked patrol car through a high-crime area in Brockton, Massachusetts, saw four men milling about a new Mercedes at a gas station. Suspecting the men were involved in drug sales, he began to run the car's license number while circling his car back around toward the gas station. Reardon observed a black man holding a "full-size, large-frame semiautomatic" run past Reardon's car in the opposite direction, aiming the gun toward the Mercedes. Dancy, 2007 WL 2789279, at *1. Reardon testified that when the Mercedes sped away, the man raised

the gun and fired a shot into the air, then jogged away toward an alleyway.

Reardon radioed for assistance, reporting that shots had been fired. "He described the shooter as a black male with a cornrow hairstyle, dressed in a gray hooded sweatshirt with lettering and dark blue jeans. Reardon also stated that the man resembled David Taylor, an individual well known to Brockton police."[1] Id. Still driving in the opposite direction, Reardon lost sight of the shooter. Based on the time of night and the path the shooter took, Reardon thought the most feasible place for the shooter to go was Boomer's, "a notorious drinking establishment" with a reputation for lawlessness. Id. Boomer's was one block from the intersection where the shooting took place and was "one of the few places in the neighborhood that was open at that time of night." Id. Reardon pulled his car around so that he could see both the street behind Boomer's[2] and Main Street, in case he was wrong and the shooter had run up that street instead.

A Massachusetts State Police anti-gang unit quickly joined Reardon: Brockton Police Officers Thomas Hyland and Michael Cesarini, and State Police Sergeant Mark Kiley and Trooper Frank

---

[1] Reardon testified that he did not actually think that Taylor was the shooter, but mentioned the resemblance in order to improve the description for other officers who knew Taylor.

[2] Reardon testified that he could not see the actual rear door to Boomer's because of a picket fence in the way.

Walls. Reardon was in plainclothes, Kiley and Walls were in state police sweatshirts or jackets with their badges and guns visible, and Hyland and Cesarini were in uniform. Walls, followed by Hyland and Kiley, entered through the bar's rear entrance, while at the same time Reardon and Cesarini entered through the front.

Trooper Walls was familiar with David Taylor and his appearance. As soon as Walls entered the bar, he spotted a man who "strongly resembled" Reardon's radioed description. Id. at *2. This man was Dancy. In addition to the hooded gray sweatshirt and jeans, Dancy was also wearing a leather jacket. Although Walls and Hyland testified that the jacket was open in the front so that the sweatshirt was still visible, the district court found that the jacket hid the sweatshirt. See id. at *2 & n.2.

Walls moved toward Dancy, who made eye contact with him. Dancy quickly turned, "thrust his hand into the right pocket of the jacket," and started to move away toward the front entrance. Id. at *2. In light of Dancy's matching the description of the street shooter and that movement, Walls interpreted Dancy's movement as meaning (correctly it turned out) that Dancy had a loaded gun in his pocket. This, Walls concluded, posed a risk to the police. Walls decided that if Dancy did have a gun, the only way to keep the situation under control was to grab the gun while it was still

in Dancy's pocket, and to keep Dancy or any bystander from removing it from the pocket.[3]

In response to Dancy's apparent move for a gun, Walls grabbed Dancy's arm and his jacket pocket. Feeling a gun in the pocket, Walls yelled "gun" several times to alert the other officers. Dancy replied, "Get off me, bitch, I ain't got no gun," and Dancy and Walls struggled. Id. Hyland tried to help Walls.

Dancy momentarily broke free and attempted to hand all or part of a .22 caliber revolver to a bystander, who refused to take it. Dancy then dropped the object to the floor. Cesarini sprayed Dancy in the face with pepper spray and Hyland and Walls wrestled Dancy to the ground and subdued him. Hyland or Kiley immediately retrieved the cylinder of the gun from the floor;[4] the cylinder contained a round of ammunition. A second cartridge was found in

_____

[3] When defense counsel asked Walls why he didn't just pull the gun out of Dancy's pocket himself, Walls replied, "It's far more dangerous if you take it out, because I'm--he's still fighting me. I am still struggling with him. I want it in that pocket, contained with my hand on it, because that's the safest location . . . . If it comes out, who knows what happens then."

[4] During the suppression hearings, Trooper Walls testified that the revolver frame stayed in Dancy's pocket during the entire struggle, and both Officer Cesarini and Officer Hyland testified that it was ultimately recovered from Dancy's pocket rather than the floor, but the district court apparently found that the account in Officer Hyland's written report that he picked all of the pieces up off the floor was more consistent with the gun's broken condition. United States v. Dancy, No. 04-CR-10387, 2007 WL 2789279, at *2 n.4 (D. Mass. Sept. 25, 2007).

Dancy's jacket pocket. The pin that locked the cylinder into the gun's frame was never found.

Before Cesarini reached the fray, he saw another man push a 9-millimeter semi-automatic pistol under one of the pool tables. Cesarini ordered the man, Kevin Jones, to drop to the floor. Jones kicked the pistol farther under the table. Cesarini and Reardon subdued and arrested Jones and secured the pistol, a 9-millimeter Smith & Wesson, which was loaded with four bullets. A spent casing that a ballistics expert matched to the gun was found just outside the bar. After Jones and Dancy were arrested, Reardon confirmed that Dancy was the street shooter he had observed fire into the air.

While Dancy and Jones were held in adjacent cells at the Brockton Police headquarters, State Trooper Erik Telford overheard the two talking. Jones said to Dancy,

> "Yo Will, you know the Smith & Wesson don't take no prints." Jones continued: "Will, I'm getting charged with the big one and you're getting charged with the little one . . . ." Dancy replied: "I know . . . and you think it's my fault because I had to go do that shit[.]"

Id. at *2 (alteration and omissions in original). These statements were admitted into evidence.

B. Proceedings in the District Court

Dancy was charged under 18 U.S.C. § 922(g)(1), for the gun and ammunition that were in his jacket pocket, on one count of possessing a firearm and ammunition after having previously been

-7-

convicted of a felony.  He was not charged with being the street shooter seen by Reardon or with possession of the 9-millimeter gun, the gun more likely used in the street shooting.  Dancy moved to suppress the evidence of the .22 caliber gun and ammunition, as well as the statements he made in the Brockton Police holding cell that Trooper Telford overheard.

The district court denied the motion to suppress, finding that while Trooper Walls's seizure of Dancy was an arrest, Reardon's and Walls's collective observations and knowledge were sufficient to establish probable cause for the arrest.  Id. at *3. The court found that probable cause was strongly supported by Reardon's thorough physical description of the person he personally observed firing a gun unlawfully into the air, the officers' "almost immediate apprehension" of Dancy following that shooting, Dancy's immediate attempt to evade the officers, and Dancy's "furtive" motion toward his pocket that "Trooper Walls reasonably interpreted as threatening."  Id.

The court found in the alternative that the officers had reasonable suspicion justifying an investigative stop of Dancy, and that their discovery of the gun during that stop provided probable cause for the arrest.  Id. at *4.  Further, the court held that "even if the initial seizure of Dancy . . . was unjustified, Dancy's forcible resistance to the arrest would have been an intervening act sufficient to break the chain of causation and

-8-

dissipate the taint of any illegality, thereby giving the officers fresh grounds for an arrest."  Id.

Dancy was convicted after a jury trial.  The PSR listed five prior state convictions as qualifying predicate offenses under the ACCA.  Dancy disputed that he had the requisite three predicate offenses.  He had twice pled guilty to drug charges; he originally disputed that he was convicted on these charges but now concedes that both are proper ACCA predicates.  He also had two sets of convictions for ABPO and ABDW.  He had pled guilty to both ABPO and ABDW for each offense.  At his federal sentencing Dancy objected that these two offenses should be counted as only one offense because, although the charges stemmed from two separate arrests two months apart, they were consolidated for sentencing by the state court.  Finally, a set of state drug charges had been disposed of as "guilty filed," a disposition Dancy argued did not constitute a conviction under Massachusetts law.  The district court found that Dancy qualified as an armed career criminal under the ACCA and sentenced him to the statutory minimum of fifteen years' imprisonment.  This was a downward departure, to which the prosecution agreed, from the guideline range of 235 to 293 months.

## II. CHALLENGES TO THE CONVICTION

### A. Motion to Suppress

In reviewing a motion to suppress, we review de novo the district court's legal determinations, including the ultimate

probable cause and reasonable suspicion determinations, and review for clear error its findings of fact and credibility determinations. See United States v. Battle, No. 10-1058, 2011 WL 724735, at *2 (1st Cir. Mar. 3, 2011); see also Ornelas v. United States, 517 U.S. 690, 699 (1996). We "construe the record in the light most favorable to the district court's ruling," United States v. Cook, 277 F.3d 82, 84 (1st Cir. 2002), and we "will uphold the denial of a motion to suppress as long as any reasonable view of the evidence supports it," Battle, 2011 WL 724735, at *2.

While officers must have probable cause in order to arrest, the Supreme Court established in Terry v. Ohio, 392 U.S. 1 (1968), and its progeny that "the police can stop and briefly detain a person for investigative purposes even if the officer lacks probable cause if the officer has reasonable suspicion supported by articulable facts that 'criminal activity may be afoot.'" United States v. Ramos, 629 F.3d 60, 65 (1st Cir. 2010) (citation omitted) (quoting Terry, 392 U.S. at 30). Both the initial seizure and the actions the police take thereafter must be reasonable. Id. A Terry stop may lead to probable cause for arrest when "the circumstances giving rise to reasonable suspicion" are combined with "the developments that unfold[] during the Terry stop." United States v. Lee, 317 F.3d 26, 32 (1st Cir. 2003).

Dancy argues that the motion to suppress should have been granted based on the district court's primary conclusion "that

-10-

Trooper Walls's attempt to physically restrain Dancy was a seizure tantamount to a formal arrest." Dancy, 2007 WL 2789279, at *3. He argues that probable cause is necessary for arrest and that the officers had no probable cause when Walls first attempted to physically restrain Dancy. Alternatively, Dancy argues that even if there was reasonable suspicion to support an investigative stop, there was never reason to frisk him for weapons.

We agree with the district court that the record presents an escalating series of events in which each step taken by the officers and Dancy led reasonably to the next. From the "reasonably thorough physical description" of the street shooter and his clothing,[5] the likelihood the shooter had gone into the bar, the "almost immediate apprehension (within three to five minutes of Reardon's initial observations)," and the obvious effort Dancy made to move away from Walls, Walls had ample reasonable suspicion to stop Dancy and investigate further. Id. In light of those background facts, we also agree with the district court that when Dancy put his hand in his pocket in a way which suggested to an experienced officer that Dancy was putting his hand on a gun, Walls had even more reason to stop and investigate Dancy, including

---

[5] Walls's suspicion that Dancy was the shooter Reardon had described was not made less reasonable by the fact that Dancy was wearing a leather jacket atop the other clothes Reardon had mentioned. As Reardon explained on cross-examination, it would have been logical for Dancy, who had just fired a gun in a public intersection, to want to alter the clothing he was wearing in case observers called the police and described what they had seen.

-11-

through a pat frisk in order to see if there was a weapon that could pose a risk to the officers.  See id.

We reject Dancy's contention that the officers were required to investigate more before they could frisk him for weapons.  "Officers are permitted to take actions to protect their own safety and the safety of others in the area," including conducting a pat-frisk if under all the circumstances they have "a particularized and objective basis to suspect the individual ha[s] a weapon."  United States v. Mohamed, 630 F.3d 1, 6 (1st Cir. 2010); see also Estrada v. Rhode Island, 594 F.3d 56, 66 (1st Cir. 2010).  Officer Walls had a particular, objective reason to suspect that Dancy was armed and involved in criminal activity.

It was when Walls felt what he knew to be a firearm in Dancy's pocket that he yelled "gun" several times and struggled with Dancy until Dancy was subdued and on the ground.  Even if Walls's first contact with Dancy was a momentary "seizure" of Dancy and the gun in his pocket, it was Dancy who then escalated and prolonged the interaction by resisting Walls's attempts to secure the weapon.  Dancy's attempt to take the gun out of his pocket and hand it off rather than give it to the police certainly justified the police in subduing him, placing him formally under arrest, and retrieving the gun parts from the floor.

Little is to be gained by parsing this rapid sequence of events frame by frame.  From the start there was reasonable

-12-

suspicion under <u>Terry</u> justifying an investigative search, and there were particularized and objective reasons to believe Dancy was armed, justifying a frisk for weapons. <u>See</u> <u>generally</u> <u>Mohamed</u>, 630 F.3d at 5-6 (finding officer had reasonable suspicion that individual, apprehended a few minutes after a shooting, was the shooter--despite small disparities between individual's and shooter's reported clothing--and that pat-frisk for weapons was reasonable). By the end there was more than ample probable cause to have seized the .22 caliber revolver and to have arrested Dancy.

B. <u>Other Arguments</u>

We briefly address the five other arguments Dancy makes challenging his conviction.

Three of Dancy's claims challenge the admission of certain evidence. First, he argues for the first time on appeal that testimony and other evidence relating to uncharged misconduct, that is, the shooting that set off the chain of events leading to his arrest, was irrelevant to the actual charged offense and deprived him of a fair trial by focusing a significant portion of the trial on what he characterizes as mere propensity evidence. Second, he argues to us, also for the first time on appeal, that expert testimony that the .22 revolver was a firearm under <u>Massachusetts</u> law misled the jury as to its obligation to apply the <u>federal</u> statute. Third, Dancy argues, as he did in the district court, that Officer Telford's testimony recounting part of the

-13-

conversation he overheard between Jones and Dancy in the cell block was improper hearsay evidence.

Dancy's fourth argument, which he also made to the district court, is that the prosecutor's misstatement of the evidence during her closing argument, which involved summarizing more of the cell-block conversation overheard by Telford than had actually been elicited from Telford during trial, required the district court to grant his motion for a mistrial.  We discuss these four arguments together.

We review the two claims that Dancy has raised for the first time on appeal for plain error, which requires that he make a four-part showing.  United States v. Olano, 507 U.S. 725, 732 (1993).  There must be 1) error that 2) is "plain," meaning "clear" or "obvious," id. at 733, that 3) was prejudicial, meaning that it "affected the outcome of the district court proceedings," id. at 734, and 4) "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings," with the fourth element within the appellate court's discretion to require, id. at 736 (quoting United States v. Atkinson, 297 U.S. 157, 160 (1936)) (internal quotation marks omitted).  See also United States v. Kinsella, 622 F.3d 75, 83 (1st Cir. 2010).

We review Dancy's preserved claim as to Telford's testimony for abuse of discretion.  United States v. McElroy, 587 F.3d 73, 80 (1st Cir. 2009).  Any error is harmless if the

-14-

government shows it is "highly probable that the error did not influence the verdict." United States v. Flores-de-Jesús, 569 F.3d 8, 27 (1st Cir. 2009) (quoting United States v. Casas, 356 F.3d 104, 121 (1st Cir. 2004)) (internal quotation marks omitted). Finally, we also review the denial of Dancy's motion for a mistrial on the grounds of prosecutorial misconduct for abuse of discretion. United States v. Gentles, 619 F.3d 75, 81 (1st Cir. 2010). The pertinent question is whether any prosecutorial misconduct "so poisoned the well" that it likely affected the outcome of the trial. United States v. Azubike, 504 F.3d 30, 39 (1st Cir. 2007).

Even if we were to assume error as to each of these four claims, none of the thresholds described above for reversal is met, because it is highly unlikely that any error affected the verdict. The evidence that Dancy knowingly possessed the .22 revolver Walls felt in Dancy's pocket is very strong, as our recitation of the facts shows. That the gun fell to the ground when Dancy tried to hand it off does not make his knowing possession any less, and there is no support in the record for the theory the defense presented at trial that the gun appeared on the floor from an unknown source. None of the evidence of knowing possession is undermined even if we assume all of Dancy's claims have merit, as they all involve rather peripheral issues.

Trooper Telford's testimony recounting portions of the cell-block conversation between Dancy and Jones was admitted on a

-15-

theory of adoptive admission.  See United States v. Miller, 478 F.3d 48, 51 (1st Cir. 2007).  The prosecution argues to us, as it did to the district court, that the testimony was also admissible on a theory that Jones's statements were reciprocal and integrated utterances providing context for Dancy's statement.  See United States v. Colón-Díaz, 521 F.3d 29, 38 (1st Cir. 2008).  At trial only two of the three admitted statements were elicited before the jury.  Telford testified to Jones's statement, "The Smith and Wesson don't hold no prints," but not to his subsequent statement, "Will, I'm getting charged with the big one and you're getting charged with the little one . . . ."  Telford also testified to hearing Dancy's statement in response, "I know, I feel you, and you think it's my fault because I had to go and do that shit. . . ."  It is unclear why only these two portions of the conversation were offered.

Dancy argues that Jones's statement, "The Smith & Wesson don't hold no prints," was likely interpreted by the jury to refer to the uncharged shooting offense and "suggested, improperly, some consciousness of guilt on Dancy's part."  We cannot say it was an abuse of discretion to admit Jones's statements, as they could be interpreted as referring to the Boomer's encounter rather than to the street shooting.  Because the comments were ambiguous, it is also highly improbable that they had any influence on the jury's

-16-

evaluation of the evidence as to the charged offense. See Flores-de-Jesús, 569 F.3d at 27.

Dancy's other claims of error are on matters even more tangential. The prosecutor's mistaken reference during closing arguments to the second statement Telford overheard, which was admitted before trial but not elicited before the jury, was isolated and apparently accidental. See Gentles, 619 F.3d at 81. Further, it was followed by strong curative instructions to the jury stating not only that lawyers' arguments are not evidence, but also that Telford's testimony had not included that statement. See id. at 81-82. Under these circumstances, it is not "likely that any prejudice surviving the instruction could have affected the outcome of the case." Id. at 82 (quoting Azubike, 504 F.3d at 39).

Similarly, Dancy's unpreserved objections to the admission of the evidence on the uncharged shooting and the concededly irrelevant testimony on the state law definition of "firearm," where the jury was clearly instructed on the federal definition, address issues that do nothing to undermine the government's case that he knowingly possessed a firearm as federally defined. Any error did not affect the outcome of Dancy's case. Kinsella, 622 F.3d at 83.

Finally, we reject Dancy's fifth argument, presented for the first time on appeal, that this court's interpretation of language in the federal definition of "firearm" in 18 U.S.C.

§ 921(a)(3) to include inoperable guns is unconstitutional under District of Columbia v. Heller, 554 U.S. 570 (2008). See 18 U.S.C. § 921(a)(3) ("The term 'firearm' means (A) any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive . . . ."); United States v. Ford, 548 F.3d 1, 7 (1st Cir. 2008) (holding that as long as the gun is real, it need not be loaded or operable at the time to be a firearm). Nothing in Heller purports to narrow the scope of what may be considered a firearm. In any event, all that was necessary to fire the .22 caliber gun was to replace the cylinder, which must always be removed in order to load the gun with ammunition. The gun could be fired without the missing cylinder pin, either by substituting a nail for the pin or by holding the cylinder in place manually.

### III. CHALLENGES TO THE SENTENCE

The court agreed with defense counsel that while Dancy, from age seventeen, had a "bad record," the court had seen "really bad records" comparatively, and Dancy's record was of picking "very low hanging fruit." Indeed, the court noted that in most instances Dancy had hurt himself, rather than others. For that reason, the court departed downward from the guideline range of 235 to 293 months, concluding that "180 months is certainly sufficient, perhaps even more than sufficient, but it's the minimum sentence I can impose."

-18-

That minimum sentence resulted from the court's finding that Dancy had committed at least three state offenses which qualified as ACCA predicate offenses. See 18 U.S.C. § 924(e)(1) ("[A] person who violates section 922(g) of this title and has three previous convictions . . . for a violent felony or a serious drug offense . . . shall be . . . imprisoned not less than fifteen years . . . ."). Dancy concedes he has two qualifying predicate drug offenses. The government concedes that one offense--a "guilty filed" state outcome--does not qualify because it is not clear that there was an actual conviction on the available facts. The question then boils down to whether Dancy's remaining Massachusetts convictions for either ABPO or ABDW qualify under the force or the residual clauses of the ACCA, described below.

A. Standard of Review

The ultimate question of law--whether a prior conviction qualifies as a predicate offense under the ACCA--is reviewed de novo. United States v. Pakala, 568 F.3d 47, 54 (1st Cir. 2009). However, there is a preliminary question of the standard of overall appellate review, as Dancy did not argue until a late round of supplemental briefing following our Holloway opinion that these prior offenses were not ACCA predicates under the Supreme Court's Begay and Johnson decisions. Begay was decided before Dancy's sentencing, and Johnson was decided after sentencing but months before he filed his opening brief in this court. The government

-19-

argues that Dancy's claim is waived or, at the very least, forfeited and reviewable only for plain error. See Igartúa v. United States, 626 F.3d 592, 603 (1st Cir. 2010) (explaining consequences of waiver and forfeiture).

Given that before our opinion in Holloway Dancy could understandably have assumed that our precedents holding that Massachusetts ABPO and ABDW convictions are ACCA predicates were not subject to question, see United States v. Am, 564 F.3d 25 (1st Cir. 2009) (ABDW); United States v. Fernandez, 121 F.3d 777 (1st Cir. 1997) (ABPO), he has not waived (that is, knowingly given up) his arguments. He has, however, forfeited them by not raising them before the district court when he could have, and so we review the district court's decision for plain error. See Johnson v. United States, 520 U.S. 461, 467-68 (1997) (plain error standard applies where settled law changes between trial and appeal and issue was not raised in district court); United States v. Barone, 114 F.3d 1284, 1294 (1st Cir. 1997) (same).

As we explain below, we conclude under the first part of the plain error test that there was no error of law in the district court's finding that Dancy's ABPO convictions qualified as ACCA predicates. This also means the outcome of this case would not be different even if the issues had been raised before the sentencing court.

B. Legal Background under the ACCA

ACCA predicate offenses include certain drug offenses and "violent felon[ies]," defined as:

> any crime punishable by imprisonment for a term exceeding one year . . . that--
> (i)  has as an element the use, attempted use, or threatened use of physical force against the person of another; or
> (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

18 U.S.C. § 924(e)(2)(B)(i) and (ii).  The Massachusetts ABPO and ABDW crimes are punishable by terms of imprisonment of more than one year, Mass. Gen. Laws ch. 265, § 13D (setting two-and-one-half-year maximum term for assault and battery on a public employee, which includes ABPO); § 15A(b) (setting ten-year maximum term for ABDW).[6]  In the ACCA sentencing statute, "[c]lause (i) is sometimes referred to as the 'force clause.'  The portion of clause (ii) following the enumerated offenses is known as the 'residual clause.'"[7]  Holloway, 630 F.3d at 256 (citations omitted).

The inquiry under the ACCA is whether the state's legal definition of the offense of conviction fulfills either clause of

---

[6]    The ACCA further provides that "any State offenses classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less" are not "crime[s] punishable by imprisonment for a term exceeding one year."  18 U.S.C. § 921(a)(20).  This limitation does not apply here.

[7]    Johnson was decided under the force clause, Johnson v. United States, 130 S. Ct. 1265, 1268 (2010); Begay under the residual clause, Begay v. United States, 553 U.S. 137, 140 (2008).

-21-

the ACCA's definition of a violent felony.  We take a categorical approach, meaning that we "consider only the offense's legal definition" under state law, "forgoing any inquiry into how the defendant may have committed the offense."  Id.; see also Taylor v. United States, 495 U.S. 575, 600 (1990).  Under the Supreme Court's decision in Shepard v. United States, 544 U.S. 13 (2005), if the state statute encompasses multiple offenses, one or more of which are not ACCA predicates, "a court may look to a restricted set of documents (e.g., indictment, plea colloquy, jury instructions) to ascertain which of the multiple offenses served as the offense of conviction."[8]  Holloway, 630 F.3d at 256-57; see generally Nijhawan v. Holder, 129 S. Ct. 2294, 2299 (2009) (explaining the categorical approach).

Under Begay, to qualify under the ACCA residual clause, the offense must both (1) pose a degree of risk that is similar to the degree of risk posed by the enumerated offenses, and (2) be roughly similar in kind to the enumerated crimes.  United States v. Almenas, 553 F.3d 27, 34 (1st Cir. 2009).  An offense is similar in kind if it "typically involve[s]" purposeful, violent, and aggressive conduct.  Begay, 553 U.S. at 144-45.  The degree of risk

---

[8]     A plurality of the Court found that this was necessary to prevent federal courts from finding disputed facts about the nature of prior convictions, a practice that would raise questions under Apprendi v. New Jersey, 530 U.S. 466 (2000), and Jones v. United States, 526 U.S. 227 (1999).  See Shepard v. United States, 544 U.S. 13, 24-26 (2005) (plurality opinion).

and likeness inquiries are questions of federal law.  See United States v. Giggey, 551 F.3d 27, 39 (1st Cir. 2008) (en banc).

In 1997, before the  Supreme Court's decisions in Begay and Johnson, we held that the Massachusetts crime of ABPO was categorically a "crime of violence" under the residual clause of the career offender Guideline.[9]  Fernandez, 121 F.3d at 780.  Our precedents also hold that ABDW is categorically a violent felony. See Am, 564 F.3d at 33 (holding ABDW is ACCA predicate under force

---

[9]   We have held that "the terms 'crime of violence' under the career offender Guideline and 'violent felony' under the ACCA are nearly identical in meaning, so that decisions construing one term inform the construction of the other."  United States v. Willings, 588 F.3d 56, 58 n.2 (1st Cir. 2009).  In United States v. Giggey, 551 F.3d 27, 36 (1st Cir. 2008) (en banc), we acknowledged that the difference between the ACCA's enumeration of "burglary" and the career offender Guideline's enumeration of the narrower "burglary of a dwelling" affected the interpretation of the Guideline's residual clause.
    Dancy attempts to expand on Giggey, arguing that because an application note to the Guideline expressly lists several additional offenses, including "aggravated assault," as crimes of violence, we cannot import into the ACCA context the analysis from any case holding that a type of assault qualifies as a crime of violence under the Guideline.
    Our opinion in Fernandez did not rely on or even mention the application notes.  Nor is the ABPO crime an aggravated assault under Massachusetts law.  See Commonwealth v. Correia, 737 N.E.2d 1264, 1266 (Mass. App. Ct. 2000) (stating that assault and battery (AB) on a public employee is a codification of the common law crime of simple AB, with additional elements related to the employee's status and engagement in performing official duties).  The Massachusetts AB and ABDW statutes list separate simple and aggravated offenses, though it is the courts and not the statutes that supply the "aggravated" title.  Compare Mass. Gen. Laws ch. 265, § 13A(a) (simple AB), with id. § 13A(b) (aggravated assault); compare id. § 15A(b) (simple ABDW), with id. § 15A(c) (aggravated ABDW); see also Commonwealth v. Assaf, No. 07-1337, 2009 WL 1616750, at *1 (Mass. App. Ct. June 11, 2009) (distinguishing between statutes for simple and aggravated assault and battery).

-23-

clause); <u>United States</u> v. <u>Glover</u>, 558 F.3d 71, 82 (1st Cir. 2009) (holding ABDW is crime of violence under career offender Guideline's residual clause). Dancy challenges the vitality of all of these precedents.

C. <u>Analysis under the ACCA</u>

Underlying Dancy's arguments as to both state crimes are several general propositions. First, federal courts sentencing under the ACCA must look to how state law defines the elements of state crimes, including decisions by the state's highest court interpreting statutory language and common law definitions. <u>See</u> <u>Johnson</u>, 130 S. Ct. 1269 (federal courts are bound by state high courts' interpretations of state law, including state statutes).

Second, under <u>Johnson</u>, if that state law crime uses alternative elements or definitions to criminalize more than one type of conduct, so that it encompasses some conduct within the ACCA and some not, and the defendant's conviction does not on its face explain which type is involved, then the mere fact of the defendant's conviction does not meet the government's burden of showing that the conviction qualifies under the ACCA. <u>Holloway</u>, 630 F.3d at 259.

Third, we held in <u>Holloway</u> that because Massachusetts law allows a conviction for simple assault and battery (AB) on a recklessness theory, without requiring purposeful or intentional conduct, the mere fact of indictment and conviction for simple AB

does not meet the government's burden to show that a defendant's simple AB conviction qualifies under either the residual or the force clause.[10]  Id. at 262.  This is because reckless simple AB does not meet Begay's requirement that under the residual clause an offense must "typically involve purposeful . . . conduct." Begay, 553 U.S. at 144-45.

From these propositions, Dancy argues that no Massachusetts state conviction for any crime involving AB can qualify under the ACCA on only the face of the conviction regardless of whether those crimes also involve additional elements.[11]  He argues that the key consideration is that all AB crimes can be committed recklessly.  See, e.g., Commonwealth v. Correia, 737 N.E.2d 1264, 1266 (Mass. App. Ct. 2000) (AB on a public employee); Commonwealth v. Burno, 487 N.E.2d 1366, 1368-69 (Mass. 1986) (ABDW).  We disagree that this sole consideration is dispositive of the ACCA question.

Holloway concerned only simple AB and not the two crimes in question here.  Each of these two crimes includes additional

---

[10]   The Holloway court remanded to allow the government to try to prove, using Shepard-approved documents, that the defendants had been convicted of crimes that qualified under either the residual clause or the force clause.  United States v. Holloway, 630 F.3d 252, 263 (1st Cir. 2011).

[11]   The PSR in Dancy's case, which the parties use as a conclusive record of his prior convictions for present purposes, determined from state court records that Dancy was convicted of ABPO stemming from two separate altercations, with no other details.

-25-

elements that distinguish this case from Holloway. It is necessary for us to discuss and resolve only the ABPO issue.[12]

We turn to the elements of the ABPO crime, as specified in the state statutes that criminalize ABPO and set forth standard charging language, and as interpreted by the Massachusetts courts. The charge was apparently brought pursuant to Mass. Gen. Laws ch. 265, § 13D, which provides: "Whoever commits an assault and battery upon any public employee when such person is engaged in the performance of his duties at the time of such assault and battery, shall be punished . . . ." This statute is separate and distinct from the statute criminalizing simple AB. See Mass. Gen. Laws ch. 265, § 13A. The standard statutory charging language for ABPO charges is: "That A.B. did assault and beat C.D., who was a police officer of the (city of Boston) (or whatever the fact may be), and who was also in the lawful discharge of his duties as such officer, as said (defendant) well knew . . . ." Mass. Gen. Laws ch. 277, § 79.

Dancy is correct that a recklessness theory of liability is available as to the action element of the state ABPO crime. Commonwealth v. Zekirias, 819 N.E.2d 166, 168 (Mass. 2004)

---

[12] The additional elements also distinguish this case from those involving broad, general state statutes with recklessness standards, such as reckless endangerment, see, e.g., United States v. Lee, 612 F.3d 170, 197 (3d Cir. 2010), or involuntary manslaughter, see, e.g., United States v. Woods, 576 F.3d 400, 410 (7th Cir. 2009).

(describing jury instructions for "the offense of intentional or reckless assault and battery on a public employee"); Correia, 737 N.E.2d at 1266 (holding that absent evidence that the legislature intended the ABPO statute to have a different culpability standard than the simple AB statute, recklessness was available). But it does not follow that any crime that can be committed recklessly must necessarily not be similar in kind to any of the ACCA enumerated offenses. Under state law the ABPO crime has additional elements that the simple AB crime does not: (1) the person assaulted must be a police officer, (2) the officer must be engaged in his or her official duties, and also (3) the defendant must know the victim of the assault and battery is a police officer engaged in performance of his or her duties. Mass. Gen. Laws ch. 277, § 79. These additional elements differentiate the mental state required for the ABPO crime from those required for simple AB.[13] They ensure that the conduct criminalized by the ABPO statute is "purposeful," which is different from the mental state required by the elements of the simple AB statute.

---

[13] In fact, the Massachusetts state courts have expressly recognized that simple AB is a lesser included offense within ABPO, appropriate where the jury finds all of the elements of simple AB but does not find that the defendant knew the victim was a police officer engaged in his or her official duties at the time of the assault. Commonwealth v. Francis, 511 N.E.2d 38, 41-42 (Mass. App. Ct. 1987); Commonwealth v. Rosario, 430 N.E.2d 866, 866 (Mass. App. Ct. 1982).

It is important that Begay specifically stated that the enumerated offenses "typically" involve purposeful conduct, Begay, 553 U.S. at 144-45, and required only that an offense be "roughly similar" in kind to the enumerated offenses in order to qualify under the ACCA, id. at 143; see also Holloway, 630 F.3d at 261 (finding that reckless simple AB "does not typically involve purposeful conduct"); Almenas, 553 F.3d at 35 n.9 (emphasizing typicality requirement). This means we should not allow hypothetical fact patterns to control our decision if they are unlikely to occur during the typical interactions which result in ABPO convictions. Indeed, the Massachusetts Supreme Judicial Court has itself cabined the meaning of "recklessness" in the ABPO context, vacating a judgment of reckless ABPO where court officers were merely "hit in the forearm" as defendant "was wildly gesturing his arms" because it was not clear that the jury had found the defendant reckless rather than merely negligent. Zekirias, 819 N.E.2d at 167. It is also true that the adjectives, such as "purposeful," that the Supreme Court used in Begay "denote qualities that are ineluctably manifested in degree and appear in different combinations; they are, therefore, imprecise aids." United States v. Williams, 529 F.3d 1, 7 (1st Cir. 2008) (footnote omitted).

The simple AB statute discussed in Holloway requires only conduct "involv[ing] a high degree of likelihood that substantial

-28-

harm will result to another," or involving "disregard of probable harmful consequences to another." Holloway, 630 F.3d at 261 (quoting Commonwealth v. Welch, 450 N.E.2d 1100, 1102-03 (Mass. App. Ct. 1983)). An AB conviction can arise from merely reckless conduct involving great risk or disregard for consequences; no additional statutory elements limit the factual circumstances in which these requirements are met to situations that typically involve purposeful conduct.[14] The elements of the offense of simple AB do not require any awareness of the victim, much less an awareness that the victim is a law enforcement officer engaged in the performance of official duties. See Welch, 450 N.E.2d at 1102-03 (listing elements of reckless simple AB).

By contrast, ABPO arises only in a narrow set of circumstances: an interaction between an individual and police officers in which the individual knows that he or she confronts an officer and that the officer is discharging his or her law enforcement duties at the time of the confrontation. This is ensured by the additional elements that the police officer "was . . . in the lawful discharge of his [or her] duties as such officer, as said (defendant) well knew." Mass. Gen. Laws ch. 277,

---

[14] The recklessness theory of simple AB is limited to cases in which the victim was actually injured, but this goes to the effect of the defendant's actions, not to the defendant's mental state. See Holloway, 630 F.3d at 261 (additional requirement under recklessness theory is that "the victim suffered some physical injury").

§ 79 (emphasis added).  By requiring proof that the defendant knew these facts as to the victim's status, the additional elements also require the prosecution to prove the defendant knew that there were one or more victims who could be injured by the defendant's actions, and yet nonetheless acted with "disregard of probable harmful consequences" or in a way that created "a high degree of likelihood [of] substantial harm" to a potential victim.  See Welch, 450 N.E.2d at 1102-03.  That the defendant must also know the potential victim's specific status as a police officer engaged in official duties only heightens the level of knowledge, and thus purposeful conduct, that must be present before a defendant can be convicted of ABPO.

As a result, in the ABPO context purposeful conduct is the norm, and what we said in Fernandez is still true: the crime of ABPO "nearly always involves the intentional striking of a police officer."  Fernandez, 121 F.3d at 780.  "At a minimum, assault and battery upon a police officer requires purposeful and unwelcomed contact with a person the defendant knows to be a law enforcement officer actually engaged in the performance of official duties."  Id.  The Massachusetts Appeals Court has recently ratified this conclusion, noting that our statement in Fernandez that ABPO requires purposeful conduct and knowledge as to the victim's identity is different from "the concept that [the defendant] intended the consequences of his action."  Commonwealth v.

-30-

Deschaine, 932 N.E.2d 854, 861 (Mass. App. Ct. 2010) (citing Fernandez, 121 F.3d at 778).

Turning to the risk component of the residual clause, what we said in Fernandez about the degree of risk involved in ABPO also remains true. The ABPO crime "nearly always poses a serious risk of actual or potential physical force and the likelihood of physical injury. That law enforcement officers usually carry weapons when on duty only heightens the serious risk of injury associated with such an assault." Fernandez, 121 F.3d at 780.

While the primary risk of ABPO is to the officer who is occupied with his or her duties to the public, there is also a great risk to the defendant whose interference with the police is likely to provoke a response of decisive force calibrated to end the matter quickly and prevent the assailant from getting control of the officer or his or her weapon or otherwise injuring the officer or bystanders. See United States v. Williams, 559 F.3d 1143, 1149 (10th Cir. 2009). "[T]he use of force is an expected, necessary part of a law enforcement officer's task of subduing and securing individuals suspected of committing crimes." Lee v. Ferraro, 284 F.3d 1188, 1200 (11th Cir. 2002). Police officers are trained to "induce compliance" in people who "resist the officers' efforts to bring [them] under control," and the techniques they may legitimately use to do so may cause serious injury to the person resisting. Jennings v. Jones, 587 F.3d 430, 441 (1st Cir. 2009)

-31-

(describing officer's use of "ankle turn control technique" taught in police academy); see also Isom v. Town of Warren, 360 F.3d 7, 10 (1st Cir. 2004) (describing officers' use of pepper spray in accordance with their training). In addition to risk to the officers and to the assailant, the confrontation between the officer and the assailant may put bystanders at risk of injury as well.

Indeed we think the serious risk of injury is greater in the ABPO situation than in several of the enumerated offenses. As we have said of the Massachusetts crime of resisting arrest, the crime involves "resisting the authority of a police officer, an official charged with defending the public." Almenas, 553 F.3d at 34. Resisting arrest poses an arguably greater risk than the enumerated offenses because the officer is "duty-bound to effectuate the arrest," resulting in "a significant risk of conflict and, concomitantly, a significant risk of injury." Id. The same is true for ABPO, which involves similar dynamics.

This great risk of physical injury is present even if the assault and battery on the officer in the enforcement of his or her duties is recklessly done. And that risk is relevant to our categorical analysis even if actual physical harm does not materialize in a particular case. Williams, 559 F.3d at 1149 ("[B]attery of an armed on-duty police officer is 'a powder keg, which may or may not explode into violence and result in physical

injury to someone at any given time, but which <u>always</u> has the serious potential to do so.'" (quoting <u>United States</u> v. <u>West</u>, 550 F.3d 952, 963 (10th Cir. 2008) (overruled on other grounds by <u>United States</u> v. <u>McConnell</u>, 605 F.3d 822 (10th Cir. 2010))). It is enough that the <u>typical</u> case of ABPO involves a serious risk of injury: the residual clause "speaks in terms of a 'potential risk,'" an "inherently probabilistic concept[]." <u>James</u> v. <u>United States</u>, 550 U.S. 192, 207 (2007) (quoting 18 U.S.C. § 924(e)(2)(B)(ii)). It need not be the case that "every conceivable factual offense covered by a statute must necessarily present a serious potential risk of injury before the offense can be deemed a violent felony." <u>Id.</u> at 208.

Because the Massachusetts crime of ABPO qualifies under the residual clause of the ACCA, we do not reach the question of whether it qualifies under the force clause.

Because Dancy has four qualified ACCA predicate offenses, we do not reach the question of whether a conviction for ABDW is itself a predicate offense.

The conviction and sentence are affirmed.