# United States Court of Appeals
## For the First Circuit

No. 11-1291

UNITED STATES OF AMERICA,

Appellee,

v.

AUSTIN GRUPEE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Torruella, Circuit Judge,
Souter, Associate Justice,*
and Boudin, Circuit Judge.

Charles W. Rankin, with whom Kerry A. Haberlin, and Rankin & Sultan, were on brief, for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

June 20, 2012

---

* The Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**SOUTER, Associate Justice.** Austin Grupee was indicted for possession of firearms and ammunition as a felon, 18 U.S.C. § 922(g)(1), and for possession of cocaine with the intent to distribute, 21 U.S.C. § 841(a)(1). He pleaded guilty, but reserved the right to appeal the denial of a motion to suppress evidence found in his house and in a car parked in the driveway. He now appeals both that denial and the sentence imposed. We affirm.

Between 2007 and 2009, the Southeastern Massachusetts Gang Task Force[1] investigated street gangs in New Bedford, Massachusetts, and on May 28, 2008, Task Force officers applied for a warrant to arrest one Desmond Roderiques, age 16, for drug trafficking. They also applied for a warrant to search for "[a]ny and all cellular telephones belonging to Desmond Roderiques, [and] [a]ny and all paperwork relating to cellular phone ownership including manuals and similar paperwork" at 54 Bedford Street, a house that Roderiques shared with Grupee and several others.

In an attached affidavit, Massachusetts State Police Trooper Jimi Grasso described how a witness cooperating with the Task Force purchased drugs from Roderiques on November 9, 2007. The witness called a "Montes Park Gang Member known to [the witness] as 'D' on his cell phone, number (508) 738-0346." At the ensuing meeting the witness purchased crack cocaine for $300, in a

---

[1] The task force comprises agents and officers from the Federal Bureau of Investigation, the Massachusetts State Police, the New Bedford Police, and the Massachusetts Parole Board.

transaction captured on audio and video recordings. Police identified "D" as Roderiques. The officers believed that Roderiques still had the same cell phone, in part because they called the number on May 28, 2008 and the phone was still active. They believed Roderiques possessed a second cell phone (with a different number), used in other recorded phone calls between Montes Park Gang members. Trooper Grasso stated that Roderiques had been arrested a number of times over the past few years and had consistently given his address as 54 Bedford Street, New Bedford, where police had often seen him coming and going, and where he was listed as living on his learner's permit from the Massachusetts Registry of Motor Vehicles, issued on August 9, 2007.

A magistrate judge issued the arrest and search warrants, which Task Force officers executed the following day, when they arrested Roderiques, escorted Grupee and other individuals present to the living room, and searched the house. The officers discovered guns, drugs, and drug paraphernalia, as well as two cell phones, in Roderiques's room. In Grupee's room, they found a blue plastic storage bin with Grupee's personal papers as well as three pistols (including a 9 millimeter), and several rounds of ammunition.

During the search inside 54 Bedford Street, a State Police drug detection dog alerted toward a black Infiniti M45 parked in the driveway. The officers then paused while they

applied for two additional warrants: one to search the house for firearms, drugs, and related materials, and another to search for the same in the car. Trooper Grasso's second affidavit described the earlier search and its fruits so far, and stated that "[a]n MSP [Massachusetts State Police] drug detection K-9 also assisted at the scene and the dog alerted on the exterior of [the Infiniti]." The warrants were issued, the officers searched the car, and in the rear seat they found a black gym bag with a bus ticket in Grupee's name inside, a bag of cocaine, and a magazine of 9 millimeter ammunition. The second search of Grupee's room uncovered more drugs and records of drug sales.

I

Grupee argues that the facts presented to the magistrate were too thin to support any of the search warrants, but we think the magistrate had the requisite "'substantial basis' for concluding that probable cause existed." United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005). As to the first search warrant, we agree with the magistrate and the district court that there was reasonable cause to think that Roderiques still possessed the cell phone used to arrange the November 9, 2007 drug sale and lived at 54 Bedford Street, as of May 28, 2008. To begin with, there was abundant evidence tying the cell phone to Roderiques. The cooperating witness knew a drug salesman, "D," who could be reached at the (508) 738-0346 number, and he called the number and arranged

-4-

to meet "D" at a certain spot.  Desmond Roderiques showed up there and sold drugs to the witness.  Grupee says that Roderiques may have completed the transaction after another "D" took the call, but this is pure fancy, unsupported and unlikely; the facts that Desmond Roderiques appeared where "D" promised to be and sold drugs as "D" promised to do are good reasons to believe that he is "D."

Grupee argues next that, even if the magistrate had enough evidence that in November Roderiques had a cell phone with a particular number that he used in a drug transaction, by next May that evidence had gone too stale to give probable cause to infer he still had it.  He points out that drug dealers often toss phones away to thwart detection, and Roderiques was recorded speaking on a second one two months after the November call.  But all of this may be granted without implying it was unreasonable to think Roderiques would still be using the same phone six months later. He was in business, after all, and some customers presumably knew "D" by the November number; he had to maintain some degree of continuity or risk losing buyers.  The fact that at some point he used another cell phone to speak to other members of the Montes Park Gang is itself equivocal; drug dealers may use different phones for work and personal use, or for customers and internal business.  And there was some confirmation that Roderiques was maintaining continuity, in the Task Force's determination that the number used in the arranged transaction was still active on May 28,

even though that fact alone did not prove conclusively that "D" was still the one answering calls to (508) 738-0346.

Grupee's staleness argument does not stop there, however, but goes also to the connection of the cell phone to 54 Bedford Street as the house where Roderiques lived. Again, the facts are against him. He had been arrested and stopped for field interrogations over the years before the warrant application, and had given 54 Bedford Street as his address each time. His learner's permit, issued in August of 2007, gave that address; and the police had seen him coming and going at the house a number of times. And even if all this activity had occurred before getting the August 2007 driving permit (which the magistrate was not told), there would nonetheless be reasons to think that he was still living at 54 Bedford Street the following May; people move from time to time, of course, but not so frequently that the evidence here can be considered stale, certainly not with an affidavit showing that he was only 16 in 2008 and so probably less mobile than an adult would have been. In sum, there was a substantial basis to find probable cause that the cell phone used in the drug transaction would be in Roderiques's possession, and be found at 54 Bedford Street on May 28, 2008.

This conclusion disposes of the challenge to the second search warrant, which is predicated on the invalidity of the first. Thus, when the affidavit supporting the second application

-6-

described the guns, drugs, and drug paraphernalia the police had already seen while searching 54 Bedford Street, it depended on observations lawfully made and properly counted in showing probable cause.

As for Grupee's challenge of the third search warrant, this one for the black Infiniti M45, his claim that the officers failed to show probable cause to believe it contained any contraband or evidence of a crime again suffers in part from his failure to undermine the first warrant and the observations by the police who executed it. The affidavit attached to the third warrant application describes a car parked in the driveway of a house in which both firearms and drugs had been found. It was registered to a Raquel Senna, whose listed address of 54 Bedford Street suggested that the car might well be connected with the activities in the house.

But Grupee's attack has a second prong, directed to the supporting affidavit's additional statement by the state trooper that an "MSP drug detection K-9 . . . alerted on the exterior of [the Infiniti]." Grupee points out that the only information given to the magistrate about the dog's capacity to alert reliably and without excessive false positives was this laconic statement that the dog was a Massachusetts State Police drug detection dog. The affidavit says nothing about the State Police's standards for

training drug-sniffing dogs or about the particular dog's success and error rate.

While we do not think Grupee's point is fatal to the warrant, neither is there anything captious about it. The reasonableness of relying on the behavior of a police dog depends on what one knows about the dog and the person who handles it, see United States v. Race, 529 F.2d 12, 14 (1st Cir. 1976); United States v. Berry, 90 F.3d 148, 153 (6th Cir. 1996), and the police can provide this sort of information in a readily available résumé of general certification standards and particular performance statistics, dog by dog, to be attached to a warrant application on a moment's notice. Here, in contrast, the magistrate was told only that a dog was used by the Massachusetts State Police to sniff out narcotics.

But parsimonious though this disclosure was, we think it passes muster under existing circuit precedent on searches authorized by warrant, which holds that describing a drug detection dog as "trained" and in the company of a drug detection agent is sufficient to allow a magistrate "reasonably [to] infer" that a trained law enforcement dog has "attained a high degree of proficiency in detecting the scent of narcotics." United States v. Meyer, 536 F.2d 963, 966 (1st Cir. 1976). True, the affidavit here did not say the dog was "trained," as it did in Meyer. But "upon a common sense and realistic reading," an affidavit by a state

-8-

police officer on the scene of a drug raid, attesting that the Massachusetts State Police is the dog's "employer" (as Grupee puts it), amounts to the same showing of reliability accepted in Meyer. And, as already noted, the third warrant did not rest on the sniff alone; the suspicion raised by the drugs and weapons found in the car owner's house formed a pattern with the canine alert to provide the magistrate with a substantial basis to find probable cause for the car search.

Indeed, even if the extant precedent were less clear, the good faith exception to the exclusionary rule would stand in the way of suppressing any evidence. With Meyer on the books and the account of the evidence found in the house, the Task Force officers acted in what the preceding discussion shows was "objectively reasonable reliance" on the search warrant, United States v. Leon, 468 U.S. 897, 922 (1984). At the least, that is, the auto warrant was not "so lacking in indicia of probable cause as to render official belief in its [validity] . . . unreasonable," and the search consequently illegal. Leon, 468 U.S. at 923.

II

Grupee also challenges his sentence, which he says was based on an advisory Sentencing Guidelines range of 110 to 137 months.[2] The district court determined this range by calculating

---

[2] Grupee was given the below-guideline sentence of 102 months' imprisonment, which the district court said it settled upon "in light of the sentences imposed on other similarly situated

the base offense level as 22, as provided by U.S. Sentencing Guidelines Manual § 2K2.1(a)(3), which sets that level for offenses that "involved a . . . semiautomatic firearm that is capable of accepting a large capacity magazine" when "the defendant committed any part of the instant offense subsequent to sustaining one felony conviction of . . . a crime of violence."

The crux of the issue (which we review de novo, <u>United States</u> v. <u>Santos</u>, 363 F.3d 19, 22 (1st Cir. 2004)), is the application of "crime of violence," which is defined as

> "any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that
> (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or
> (2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another."

U.S. Sentencing Guidelines Manual § 4B1.2(a). Grupee argues that neither his conviction for assault and battery of a police officer (ABPO) under Mass. Gen. Laws ch. 265, § 13D, nor his conviction for resisting arrest under Mass. Gen. Laws ch. 268, § 32B, was a "crime of violence" under the Guidelines. But our own recent precedent addressing exactly these crimes is squarely against him.

---

defendants." Because we hold there was no error in the initial guideline calculation, we do not address the government's claim that any error in setting the range was harmless because the district court would have imposed a 102-month sentence in any event.

In <u>United States</u> v. <u>Dancy</u>, 640 F.3d 455 (1st Cir. 2011), a panel of this court determined that ABPO as defined by the Massachusetts statute is a "violent felony" for purposes of the Armed Career Criminal Act (ACCA), a term "nearly identical in meaning" to "crime of violence" under the Sentencing Guidelines, <u>United States</u> v. <u>Holloway</u>, 630 F.3d 252, 254 n.1. (1st Cir. 2011); <u>see</u> 18 U.S.C. § 924(e)(2)(B) (defining "violent felony" in language virtually identical to § 4B1.2(a) of the Guidelines). The panel applied the test established in <u>Begay</u> v. <u>United States</u>, 553 U.S. 137, 142-45 (2008), and concluded that committing ABPO raised roughly the same risk of bodily harm as the offenses enumerated in 18 U.S.C. § 924(e)(2)(B)(ii), to which it was similar in kind. <u>Dancy</u>, 640 F.3d at 468-70. It thus qualified as a violent felony under the ACCA's residual clause, covering offenses that "otherwise involve[] conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B). Given <u>Dancy</u>, ABPO is a crime of violence under the identical residual clause of U.S. Sentencing Guidelines Manual § 4B1.2(a).

Grupee would have us look behind <u>Dancy</u> because he says the case applied the <u>Begay</u> test incorrectly, but this is beside the point, since we are bound by a prior panel decision, absent any intervening authority. <u>See, e.g.</u>, <u>Peralta</u> v. <u>Holder</u>, 567 F.3d 31, 35 (1st Cir. 2009). Grupee tepidly suggests that <u>Sykes</u> v. <u>United States</u>, 131 S.Ct. 2267 (2011), undermines <u>Dancy</u> by drawing a line

-11-

between crimes committed knowingly or intentionally and crimes, like ABPO, which can be committed recklessly, see id. at 2276. But Sykes merely indicates that courts need not apply Begay to intentional or knowing crimes; Begay still governs the characterization of other crimes, and Dancy applied its test in holding that even the reckless variant of ABPO is a violent felony.

Although the district court came out the other way on ABPO, this did not matter to the result it reached because one "crime of violence" is all that is needed under § 2K2.1(a)(3), and it treated Grupee's other prior felony of resisting arrest as a "crime of violence" under the Guidelines. Current precedent agrees, this time United States v. Almenas, 553 F.3d 27, 32-35 (1st Cir. 2009). Grupee again attacks the panel decision as error in applying the Begay test, a dubious assertion we do not consider, again owing to the law of the circuit doctrine. Grupee further attacks Almenas as being at odds with the subsequently-decided Chambers v. United States, 555 U.S. 112 (2009). But this court explicitly rejected that claim in United States v. Weekes, 611 F.3d 68, 72-73 (1st Cir. 2010).

**Affirmed.**