**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 11-4870**

UNITED STATES OF AMERICA,

　　　　　　　　Plaintiff - Appellee,

　　　v.

JOLON DEVON CARTHORNE, SR.,

　　　　　　　　Defendant - Appellant.

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  William L. Osteen, Jr., District Judge.  (1:10-cr-00096-WO-1)

Argued:  January 29, 2013　　　　　Decided:  August 13, 2013

Before DAVIS and KEENAN, Circuit Judges, and John A. GIBNEY, Jr., United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by published opinion.  Judge Keenan wrote the majority opinion, in which Judge Gibney joined.  Judge Davis wrote a separate opinion concurring in part and dissenting in part.

**ARGUED:** Matthew McGavock Robinson, ROBINSON & BRANDT, PSC, Covington, Kentucky, for Appellant.  Anand P. Ramaswamy, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.  **ON BRIEF:** Ripley Rand, United States Attorney, Greensboro, North Carolina, for Appellee.

BARBARA MILANO KEENAN, Circuit Judge:

Jolon Devon Carthorne, Sr. was convicted upon his plea of guilty to possession with intent to distribute cocaine base and possession of a firearm in furtherance of a drug trafficking crime. The district court sentenced Carthorne to a term of 300 months' imprisonment, after determining that Carthorne had two predicate offenses rendering him a "career offender" under the Sentencing Guidelines. The issue before us on appeal is whether the district court committed plain error in holding that Carthorne's prior conviction for assault and battery of a police officer, in violation of Virginia Code § 18.2-57(C), categorically qualified as a "crime of violence," and constituted a predicate offense for the career offender enhancement.

Upon our review, we hold that a conviction under Virginia Code § 18.2-57(C) is not categorically a crime of violence, because the offense of assault and battery referenced in that statute is defined by the common law, the elements of which do not substantiate a serious potential risk of injury in the usual case. However, we further hold that the district court did not commit plain error in reaching a contrary conclusion, given the absence of controlling authority and the divergence of opinion among our sister circuits. Accordingly, we affirm the district court's judgment.

2

The facts of Carthorne's present offenses are not disputed. In December 2009, agents of the United States Marshals Service arrested Carthorne at a residence in Greensboro, North Carolina, pursuant to a warrant for an offense unrelated to the present case. While the agents were at the residence, they observed certain items in plain view that appeared to be cocaine base and digital scales. Law enforcement officers later returned to the residence with a search warrant, and seized a firearm, ammunition, a digital scale, 489.8 grams of cocaine base, and a shoe box containing $9,915. Carthorne later waived his Miranda rights, and admitted that he had possessed the cocaine base and had "handled" the firearm.

In June 2010, Carthorne pleaded guilty to two counts of a five-count indictment, namely, possession with intent to distribute 489.8 grams of cocaine base, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) (the narcotics count), and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (the firearm count). The government agreed to dismiss the remaining counts upon the district court's acceptance of Carthorne's guilty plea.

Although the parties' plea agreement did not contain any stipulations concerning calculations under the Sentencing Guidelines, the government agreed to recommend a three-level

reduction in Carthorne's offense level based on acceptance of responsibility. The district court accepted Carthorne's guilty plea, and ordered the preparation of a presence report.

In November 2010, a probation officer filed a final presentence report (the PSR).[1] In the PSR, the probation officer recommended that Carthorne be sentenced as a "career offender," pursuant to U.S.S.G. § 4B1.1.[2] The probation officer identified two predicate offenses in support of the recommended career offender enhancement: (1) a felony conviction in 2003 for distribution of cocaine base; and (2) a felony conviction in 2002 for assault and battery of a police officer (the Virginia ABPO conviction), in violation of Virginia Code § 18.2-57(C). The district court determined that under the Guidelines, the cocaine distribution offense was a "controlled substance offense" under Section 4B1.2(b), and that the Virginia ABPO conviction was a "crime of violence," within the meaning of Section 4B1.2(a).

The Virginia ABPO conviction arose after an incident in which, apparently without provocation, Carthorne spit in a

---

[1] The 2010 edition of the United States Sentencing Commission Guidelines Manual was used to calculate Carthorne's Guidelines range.

[2] A defendant qualifies as a career offender if he has at least two prior felony convictions for a "crime of violence" or a "controlled substance offense," as those terms are defined in the Guidelines. U.S.S.G. § 4B1.1(a).

police officer's face. The PSR provided the following description of the incident, to which Carthorne raised no objection: "On May 7, 2002, Lynchburg, Virginia, police officers were on foot patrol in the White Rock area of the city when the defendant walked toward the officers. An officer asked the defendant, 'What's up?', to which Defendant Carthorne replied, 'What's up with your mother?' and spit in the officer's face. The defendant was placed under arrest after a brief struggle." As set forth in the PSR, Carthorne was found guilty in a Virginia state court of the felony offense of assault and battery of a law enforcement officer under Virginia Code § 18.2-57(C), and was sentenced to a term of three years' imprisonment, with all but six months suspended.

As a result of the district court's determination that Carthorne qualified as a "career offender" under the Guidelines, Carthorne's Guidelines range for the present offenses increased greatly. The probation officer initially stated in the PSR an adjusted offense level of 32 for the narcotics count but, based on Carthorne's career offender status, his offense level was increased to 37. U.S.S.G. § 4B1.1. Taking into account the three-point downward adjustment for acceptance of responsibility, Carthorne was assigned a total offense level of 34. The PSR also indicated that Carthorne had nine criminal history points for qualifying offenses, which otherwise would

5

have resulted in a criminal history category of IV. However, Carthorne's career offender status automatically placed him in the highest criminal history category of VI.

Accordingly, based on an offense level of 34 and a criminal history category of VI on the narcotics count, as well as the consecutive mandatory minimum term of 60 months' imprisonment on the firearm count, the probation officer calculated Carthorne's Guidelines range as being between 322 and 387 months' imprisonment. Without the career offender enhancement, however, Carthorne's Guidelines range would have been between 181 and 211 months' imprisonment.[3] Carthorne did not file an objection to the PSR's conclusion that he should be classified as a career offender.[4]

At the sentencing hearing, the district court adopted the findings in the PSR. The district court determined that

---

[3] Under the PSR's Guidelines calculations, absent the career offender enhancement, Carthorne's narcotics count would have an adjusted offense level of 32. After the three-point adjustment for acceptance of responsibility, the total offense level would have been 29. The PSR also provided that Carthorne's criminal history category would have been IV without the enhancement. Therefore, the Guidelines range for the narcotics count would have been between 121 and 151 months' imprisonment, and a mandatory, additional 60 months would have been added for the firearm count.

[4] Carthorne raised other objections to the PSR that are not germane to this appeal.

Carthorne qualified as a career offender, and that his Guidelines range was between 322 and 387 months' imprisonment.

The district court also heard argument from the parties regarding the sentencing factors set forth in 18 U.S.C. § 3553. Carthorne requested a downward departure or variance to achieve a total sentence of 180 months' imprisonment for both offenses, citing his cooperation with law enforcement officials and his family obligations.

Although the parties did not raise any issue at sentencing regarding whether the Virginia ABPO conviction qualified as a crime of violence, the district court asked Carthorne's counsel whether the court needed to reach any conclusions about the nature of the offense. Carthorne's counsel responded that he had researched the matter, and "would like to have been lucky to have found a case that says spitting on an officer is not an assault," given that Carthorne "didn't hurt" the officer and that "[t]here was no violence." However, counsel stated that he believed that such an argument would be "without merit," based on his understanding of the categorical approach used to determine whether a particular offense constituted a crime of violence.

The district court found that the career offender enhancement was proper, especially in view of the Virginia ABPO conviction, which the court described as "almost an unfathomable

7

offense." The district court did not specify which clause of Section 4B1.2(a) the court relied on in determining that the Virginia ABPO conviction qualified as a crime of violence. However, the court stated that, "in light of Mr. Carthorne's cooperation, I will go to the low end of the guideline range and vary slightly in recognition of his unusual and extraordinary acceptance of responsibility." Accordingly, the district court varied downward by 22 months from the low end of Carthorne's Guidelines range, and sentenced him to a term of 300 months' imprisonment.

## II.

### A.

We first consider the applicable standard of review. Carthorne contends that the issue whether a predicate offense qualifies as a crime of violence under the Guidelines is an issue of statutory construction that we review de novo. The government, however, asserts that because Carthorne failed to preserve this challenge in the district court, we should review the issue only for plain error.

Generally, we review de novo an issue of law whether a prior offense qualifies as a crime of violence for purposes of the Guidelines' career offender enhancement. United States v. Jenkins, 631 F.3d 680, 682 (4th Cir. 2011). However, when a

8

defendant has not objected to that classification before the district court, we review such a question for plain error. See Fed. R. Crim. P. 52(b); United States v. Olano, 507 U.S. 725, 731-32 (1993).

Carthorne did not object to the district court's classification of the Virginia ABPO conviction as a crime of violence, even after the district court inquired about the issue, nor did Carthorne object to the court's determination that he qualified as a career offender. Accordingly, we review this issue for plain error.[5]

The Supreme Court has cautioned appellate courts against the "reflexive inclination" to reverse unpreserved error. See Puckett v. United States, 556 U.S. 129, 134 (2009) (citation

---

[5] The government has urged that we apply plain error review, both in its brief and at oral argument. Therefore, we conclude that the government has defaulted any potential argument that Carthorne entirely waived review of this issue. See United States v. Powell, 666 F.3d 180, 185 n.4 (4th Cir. 2011) (government abandoned arguments by failing to raise them in its appellate brief); see also United States v. Tichenor, 683 F.3d 358, 362-63 (7th Cir. 2012) (reviewing issue whether prior offense was a crime of violence for plain error, even though the defendant conceded the issue to the district court, because "the government has waived the waiver argument"); United States v. Bonilla-Mungia, 422 F.3d 316, 319 (5th Cir. 2005) (holding that, because the government failed to argue in its brief that the defendant had "waived any objection to his crime-of-violence enhancement at sentencing," "the Government has waived its waiver argument," and plain error review applied); United States v. Beckham, 968 F.2d 47, 54 n.5 (D.C. Cir. 1992) (holding that, because the government did not object in its brief to the defendant's failure to raise a downward departure argument to the lower court, the government "waiv[ed] any waiver argument").

omitted).  As a result, relief on plain error review is "difficult to get, as it should be." United States v. Dominguez Benitez, 542 U.S. 74, 83 n.9 (2004).

To establish plain error, a defendant has the burden of showing: (1) that an error was made; (2) that the error was plain; and (3) that the error affected his substantial rights. Henderson v. United States, 133 S. Ct. 1121, 1126 (2013); Olano, 507 U.S. at 732-35.  When a defendant has established each of the above elements, the decision to correct the error remains within an appellate court's discretion, and we have held that we will exercise that discretion only if the error "would result in a miscarriage of justice or would otherwise seriously affect the fairness, integrity or public reputation of judicial proceedings."  United States v. Whitfield, 695 F.3d 288, 303 (4th Cir. 2012) (quoting United States v. Robinson, 627 F.3d 941, 954 (4th Cir. 2010) (internal quotation marks omitted)).

B.

We therefore turn to address the first requirement for plain error, and consider whether the district court erred in determining that assault and battery of a police officer in Virginia is categorically a crime of violence within the meaning of the Guidelines' residual clause.  The Guidelines define a "crime of violence" as any state or federal offense punishable by imprisonment for a term exceeding one year, that

10

> (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or
>
> (2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

U.S.S.G. § 4B1.2(a). Of particular significance here, the second prong of this definition includes a "residual" clause that encompasses offenses, other than the listed crimes, which present a comparable "serious potential risk of physical injury to another."

Carthorne argues that the district court erred in holding that assault and battery of a police officer in Virginia, under Virginia Code § 18.2-57(C), categorically qualified as a crime of violence under Section 4B1.2(a). Carthorne contends, and the government agrees, that the Virginia ABPO conviction did not have as an element of the offense "the use, attempted use, or threatened use of physical force against the person of another," within the meaning of Section 4B1.2(a)(1). However, Carthorne additionally asserts that the Virginia ABPO conviction also does not qualify as a "crime of violence" under the residual clause of Section 4B1.2(a)(2), because the offense does not involve "conduct that presents a serious potential risk of physical injury to another." U.S.S.G. § 4B1.2(a)(2).

11

In response, the government maintains that the Virginia ABPO conviction categorically qualifies as a crime of violence under the language of the residual clause. U.S.S.G. § 4B1.2(a)(2). According to the government, an offense committed under Virginia Code § 18.2-57(C) presents such a risk of injury and is different from ordinary common law assault and battery because the offense is "carried out on an armed victim who is duty-bound to respond to the crime." Citing precedent from two of our sister circuits, the government argues that "battery of an armed on-duty police officer is a powder keg, which may or may not explode into violence and result in physical injury to someone at any given time, but which always has the serious potential to do so." United States v. Williams, 559 F.3d 1143, 1149 (10th Cir. 2009); see also United States v. Fernandez, 121 F.3d 777, 779-80 (1st Cir. 1997). We disagree with the government's arguments.

The categorical approach first articulated in Taylor v. United States, 495 U.S. 575 (1990), serves as the cornerstone of our analysis whether a prior offense qualifies as a "crime of violence" under Section 4B1.2(a). Pursuant to the categorical approach, we examine "the fact of conviction and the statutory definition of the prior offense" to determine "whether the elements of the offense are of the type that would justify its inclusion within the residual [clause], without inquiring into

the specific conduct of this particular offender."[6]  Sykes v. United States, 131 S. Ct. 2267, 2272 (2011) (emphasis omitted) (quoting James v. United States, 550 U.S. 192, 202 (2007)).  The "central feature" of the categorical approach is "a focus on the elements, rather than the facts, of a crime."  Descamps v. United States, Slip Op. at 8 (June 20, 2013).

In very limited circumstances, we may modify the categorical approach and consider specific documents in the record of a case to determine whether a prior offense is a crime of violence.[7]  See United States v. Torres-Miguel, 701 F.3d 165, 167 (4th Cir. 2012).  However, the Supreme Court in Descamps recently has emphasized that the modified categorical approach serves only the "limited function" of supplementing the categorical analysis "when a divisible statute, listing potential offense elements in the alternative, renders opaque

---

[6] We rely on precedents addressing whether an offense is a crime of violence under the Guidelines "interchangeably with precedents evaluating whether an offense constitutes a 'violent felony'" under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(2)(B), as the two terms are defined in a "substantively identical" manner.  United States v. King, 673 F.3d 274, 279 n.3 (4th Cir. 2012) (citation omitted).

[7] The modified categorical approach permits consideration of the indictment, any plea agreements, any transcripts of a plea colloquy between the trial judge and the defendant, findings of fact and conclusions of law rendered in a bench trial, jury instructions and verdict forms, or other comparable judicial records revealing the factual basis for the conviction.  Johnson v. United States, 559 U.S. 133, 144 (2010).

13

which element played a part in the defendant's conviction." Descamps, at 5. A statute is "divisible" when it is comprised of "multiple, alternative versions of the crime." Id. at 6-7. Thus, the Court has explained that the modified categorical approach is applicable only "when a defendant was convicted of violating a divisible statute," and then, only "to determine which statutory phrase was the basis for the conviction." Id. at 8; United States v. Gomez, 690 F.3d 194, 200 (4th Cir. 2012) (holding that the modified categorical approach is applicable only to consideration of statutory offenses in which the statute itself is divisible).

Virginia Code § 18.2-57(C) provides, in material part, that if any person (1) "commits an assault or an assault and battery against another" (2) "knowing or having reason to know that such other person is . . . a law enforcement officer" (3) "engaged in the performance of his public duties," he or she shall be guilty of a Class 6 felony.[8] The terms "assault" and "battery" are not defined in this statute but are defined by common law in Virginia. Montague v. Commonwealth, 684 S.E.2d 583, 588-89 (Va. 2009).

---

[8] In addition to law enforcement officers, several other categories of individuals are covered by the statute, including but not limited to corrections officers, firefighters, and employees of the Commonwealth charged with supervising sexually-violent predators. Va. Code § 18.2-57(C).

14

Under Virginia common law, an assault is "an attempt with force and violence, to do some bodily hurt to another, whether from wantonness or malice, by means calculated to produce the end." Id. at 588 (citation omitted). A battery is defined separately as "the actual infliction of corporal hurt on another that is done willfully or in anger." Id. Thus, under Virginia common law, commission of a battery requires physical contact with a victim, while commission of an assault does not. Jones v. Commonwealth, 36 S.E.2d 571, 572 (Va. 1946) ("Battery is the actual infliction of corporal hurt on another (e.g., the least touching of another's person).") (emphasis omitted); Bowie v. Murphy, 624 S.E.2d 74, 80 (Va. 2006) ("physical injury is not an element" of assault).

In United States v. White, we further explained that under Virginia law a perpetrator need not intend to or actually inflict physical injury to commit assault and battery. See 606 F.3d 144, 148 (4th Cir. 2010). A completed battery, which includes an assault, may be committed by any injury "however small it may be, as by spitting in a man's face, or in any way touching him in anger, without lawful provocation." See id. (emphasis omitted) (quoting Hardy v. Commonwealth, 17 Gratt. 592, at *6 (Va. 1867)). Even "[t]he slightest touching of another . . . if done in a rude, insolent, or angry manner, constitutes a battery for which the law affords redress."

15

Crosswhite v. Barnes, 124 S.E. 242, 244 (Va. 1924) (citation omitted); accord White, 606 F.3d at 148.

As evidenced by the statutory language quoted above, Virginia Code § 18.2-57(C) provides in the disjunctive two distinct crimes, namely, assault on a police officer and the separate crime of assault and battery of a police officer. The statutory crime of assault and battery of a police officer plainly requires the commission of a battery as an element of the crime, while the separate offense of assault on a police officer does not include such an element.

The divisible nature of Virginia Code § 18.2-57(C), however, does not require application of the modified categorical approach in the present case because the parties agree, and the record shows, that Carthorne was convicted under that statute of the distinct offense of assault and battery of a police officer (ABPO in Virginia). See Descamps, at 6 (the modified categorical approach is employed "to determine which of a statute's alternative elements formed the basis of the defendant's prior conviction"); Gomez, 690 F.3d at 200. Thus, our consideration of Carthorne's prior conviction must be examined solely under the categorical approach to determine whether ABPO in Virginia qualifies as a crime of violence under Section 4B1.2(a) of the Guidelines. See Descamps, at 19.

16

C.

In addressing the issue whether ABPO in Virginia is categorically a crime of violence, we are guided by circuit precedent. In United States v. White, we held that the Virginia offense of "assault and battery against a family or household member," Va. Code § 18.2-57.2, did not have "as an element, the use or attempted use of physical force."[9] 606 F.3d at 153. We reached that conclusion based on the decision of the Supreme Court in Johnson v. United States, 559 U.S. 133 (2010). There, the Court held that a Florida statute prohibiting battery, which was satisfied "by any intentional physical contact, no matter how slight," did not have "as an element the use . . . of physical force against the person of another."[10] Id. at 136-38. Accordingly, the Supreme Court concluded that the Florida offense was not a "violent felony" under the ACCA. Id.

---

[9] The issue presented in White was whether that Virginia offense qualified as a "misdemeanor crime of domestic violence," within the meaning of 18 U.S.C. § 921(a)(33)(A), because it included "as an element, the use or attempted use of physical force." 606 F.3d at 147. The definition of a "misdemeanor crime of domestic violence," found in 18 U.S.C. § 921(a)(33)(A), does not include a clause comparable to the residual clause definition for a "crime of violence." Id.

[10] Because the government waived reliance on the residual clause in the lower courts, the Court in Johnson declined to consider whether battery in Florida qualified as a violent felony under the residual clause. 559 U.S. at 145.

17

The Court in Johnson defined the term "physical force" as "force capable of causing physical pain or injury to another person." Id. at 140. Relying on this definition, we held in White that the Virginia statutory offense of assault and battery of a family member, which could be accomplished by the merest touching no matter how slight, did not have "as an element, the use or attempted use of physical force." 606 F.3d at 153.

This principle is equally applicable in the present case, in which common law battery is a required element of ABPO in Virginia. In accord with our analysis in White, therefore, we hold that because ABPO in Virginia encompasses any common law battery, however slight, that statute does not categorically have "as an element the use, attempted use, or threatened use of physical force against another."[11] See U.S.S.G. § 4B1.2(a)(1).

We disagree with the government's argument that ABPO in Virginia nevertheless categorically qualifies as a crime of violence under the residual clause of Section 4B1.2(a)(2), because that offense "presents a serious potential risk of physical injury to another." U.S.S.G. § 4B1.2(a)(2). In determining whether a crime categorically qualifies as a crime of violence under the residual clause, we consider whether "the

---

[11] The parties do not dispute that after White, the Virginia ABPO conviction does not qualify as a crime of violence under U.S.S.G. § 4B1.2(a)(1).

18

elements of the offense are of the type that would justify its inclusion within the residual [clause]," in that those elements "present[] a serious potential risk of physical injury to another." Sykes, 131 S. Ct. at 2272-73; see U.S.S.G. § 4B1.2(a)(2).

The presence of a serious potential risk of physical injury ordinarily divides crimes that categorically qualify as crimes of violence from those that do not. Sykes, 131 S. Ct. at 2275. The enumerated offenses in Section 4B1.2(a)(2), namely, burglary of a dwelling, arson, extortion, and crimes involving the use of explosives, provide a benchmark for the level of risk required to qualify as a crime of violence. See James, 550 U.S. at 203 (asking whether "the risk posed by [the offense in question] is comparable to that posed by its closest analog among the enumerated offenses"). We gauge this risk by considering "whether the conduct encompassed by the elements of the offense, in the ordinary case, presents a serious potential risk of injury to another." Id. at 208.

We need not "hypothesize" about "unusual cases" to conclude that ABPO in Virginia often will not present a serious potential risk of injury. See id. at 207-08 ("metaphysical certainty" of a serious potential risk of injury is not required). The "key" to the categorical approach "is elements, not facts," Descamps, at 5, and the elements of ABPO in Virginia plainly show that

19

this statutory offense, which is predicated on the commission of common law assault and battery, proscribes a very broad range of conduct. In fact, it is a mainstay of Virginia jurisprudence that the common law crime of assault and battery may be accomplished by the slightest touching or without causing physical injury to another. See, e.g., White, 606 F.3d at 148; Pugsley v. Privette, 263 S.E.2d 69, 74 (Va. 1980); Crosswhite, 124 S.E. at 244; Lynch v. Commonwealth, 109 S.E. 427, 428 (Va. 1921). Thus, because this physical contact element of ABPO in Virginia may be satisfied in a relatively inconsequential manner, that statute cannot, by reason of its elements, be viewed as presenting a serious potential risk of physical injury. See United States v. Evans, 576 F.3d 766, 768 (7th Cir. 2009) (stating that "insulting or provoking physical contact," an offense that "could be no more violent than spitting," is not "comparable to burglary, arson, extortion, or a crime involving the use of explosives," "[n]or could it be said to present a serious risk of physical injury") (emphasis in original).

Our conclusion is not altered by the fact that the victim in an ABPO in Virginia is a law enforcement officer engaged in the performance of official duties. Although some of our sister circuits addressing ABPO in other jurisdictions have reached a contrary conclusion, see, e.g., United States v. Dancy, 640 F.3d 455, 470 (1st Cir. 2011), United States v. Williams, 559 F.3d

20

1143, 1149 (10th Cir. 2009), <u>Rozier v. United States</u>, 701 F.3d 681, 682 (11th Cir. 2012), we decline to adopt their analysis, because we do not think that the victim's occupation as a trained law enforcement officer, of itself, elevates the risk of physical injury to a level comparable to that found in the commission of burglary of a dwelling, arson, extortion, or crimes involving explosives. Moreover, the elements of ABPO in Virginia do not restrict the scope of offending conduct in a manner that signals such an elevated serious potential risk of physical injury, as would be the case by adding the element of use of a dangerous instrumentality or by requiring more than minimal physical contact. <u>See</u> <u>United States v. Hampton</u>, 675 F.3d 720, 731 (7th Cir. 2012) (explaining that "vehicular flight is inherently more risky than making insulting or provoking contact with an officer," because such flight involves the "use of a dangerous instrumentality"); <u>Evans</u>, 576 F.3d at 768 (requiring intended or actual application of more than a de minimis level of physical contact).

We would do a great disservice to law enforcement officers by accepting the government's contention that a police officer who is a victim of ABPO in Virginia is like a powder keg, capable of exploding into violence. Unlike an actual "powder keg," which, once ignited, has no governor to regulate its destructive force, <u>see</u> <u>Sykes</u>, 131 S. Ct. at 2273 (citing the

21

degree of risk inherent in arson), law enforcement officers can rely on their training and experience to determine the best method of responding to any perceived threat.

Undoubtedly, ABPO in Virginia can be committed in a manner creating a risk of escalating violence. And, even in less serious situations, law enforcement officers may be required to escalate their response to offending conduct to effect a seizure of the perpetrator. Nevertheless, because the elements of the crime of ABPO in Virginia can be satisfied in widely diverging contexts, including the use of a poking finger or the incidence of other minimal physical contact, we conclude that ABPO in Virginia does not constitute an offense "that ordinarily induces an escalated response from the officer that puts the officer and others at a similar serious risk of injury," within the meaning of Section 4B1.2(a)(2). See Hampton, 675 F.3d at 731.

Based on these considerations, we conclude that the crime of ABPO in Virginia does not present the serious potential risk of physical injury as that presented, for example, in a confrontation between an occupant of a dwelling and a burglar "attempting a break-in," James, 550 U.S. at 203-04, or "[w]hen a perpetrator defies a law enforcement command by fleeing in a

22

car," thereby using a dangerous instrumentality,[12] see Sykes, 131 S. Ct. at 2273. Accordingly, upon our review of the elements of the offense of ABPO in Virginia, we hold that the district court erred in determining that Carthorne's conviction for ABPO in Virginia categorically qualified as a crime of violence under Section 4B1.2(a) of the Guidelines.[13]

---

[12] The Supreme Court has also held that, for an offense to fall within the residual clause, it must be "roughly similar, in kind as well as in degree of risk posed," to arson, burglary, extortion, and crimes involving explosives. See Begay v. United States, 553 U.S. 137, 143 (2008). In Begay, the Court explained that the listed crimes "all typically involve purposeful, violent, and aggressive conduct." Id. at 144-45 (citation and internal quotation marks omitted). Because only de minimis physical contact is required to commit ABPO in Virginia, we also conclude that the offense is not categorically a crime of violence under this standard because the elements of the offense do not substantiate the proscribed conduct as "violent," even if it could be considered "purposeful" and "aggressive." See United States v. Thornton, 554 F.3d 443, 448 (4th Cir. 2009) (explaining that an offense must fall within all three types of conduct to be similar in kind to the enumerated offenses).

[13] Our conclusion is not altered by the decision of this Court in United States v. Aparicio-Soria, ___ F.3d ___, 2013 WL 3359069 (4th Cir. July 5, 2013). There, the Court held that the Maryland offense of resisting arrest, under Md. Code, Crim. Law § 9-408(b)(1), was categorically a crime of violence under U.S.S.G. § 2L1.2(b)(1)(A)(ii). This conclusion was based on the Court's holding that the Maryland offense "has as an element the use, attempted use, or threatened use of physical force against the person of another." See id. at *4.

Here, in contrast, this Court's earlier decision in White has resolved the issue whether assault and battery in Virginia has as an element the attempted, threatened, or actual use of physical force. As stated above, this Court held in White that common law assault and battery in Virginia does not contain such an element. 606 F.3d at 148, 153. This decision in White (Continued)

D.

Based on the above holding, we turn to the second step of our plain error analysis to consider whether the district court's error was "plain." We conclude that the district court's error was not so clear or obvious as to meet that high bar.

Under our review for plain error, our "authority to remedy [an] error . . . is strictly circumscribed." Puckett, 556 U.S. at 134. The term "plain" error is synonymous with "clear" or "obvious" error. Olano, 507 U.S. at 734. An error is plain "if the settled law of the Supreme Court or this circuit establishes that an error has occurred." United States v. Maxwell, 285 F.3d

---

controls our present holding that ABPO in Virginia does not contain such an element and that, therefore, this offense does not categorically qualify as a crime of violence under Section 4B1.2(a)(1) of the Guidelines. See id.

Additionally, we observe that the decision in Aparicio-Soria is inapposite because the crime of resisting arrest in Maryland requires that a person intentionally resist a lawful attempt to arrest him or her, by "refus[ing] to submit" and by "resist[ing] by force or threat of force." Rich v. State, 44 A.3d 1063, 1071, 1077 (Md. Ct. Spec. App. 2012). Such acts are not encompassed by the elements of ABPO in Virginia, which do not require threatening or forceful resistance to an assertion of police authority. Finally, we note that, based on the holding in Aparicio-Soria, the Court was not required in that case to address the issue whether the Maryland offense qualified as a "crime of violence" on the basis of presenting "a serious potential risk of physical injury." By comparison, our decision here addresses that issue, as well as the "physical force" prong of Section 4B1.2(a)(1).

24

336, 342 (4th Cir. 2002) (citation omitted).  Additionally, the Supreme Court has explained that irrespective "whether a legal question was settled or unsettled at the time of [the district court's decision], it is enough that an error be 'plain' at the time of appellate consideration" to constitute plain error. Henderson, 133 S. Ct. at 1130-31 (citation and internal grammatical marks omitted).

Prior to the present case, this Circuit had not addressed the issue whether ABPO in Virginia was a crime of violence under the Guidelines' residual clause.  While our decision in White provided authoritative guidance about the elements of common law assault and battery in Virginia, requiring the conclusion that ABPO in Virginia does not have "as an element the use, attempted use, or threatened use of physical force against the person of another," White, 606 F.3d at 153, that decision was not binding precedent on the issue whether ABPO in Virginia is a crime of violence under the residual clause as presenting "a serious potential risk of physical injury to another."  See U.S.S.G. § 4B1.2(a)(2).

We further observe that our sister circuits are not in accord on the issue whether the offense of assault and battery on a police officer in other jurisdictions qualifies as a crime of violence (or violent felony) under the residual clause. Compare Rozier, 701 F.3d at 682; Dancy, 640 F.3d at 470; and

25

Williams, 559 F.3d at 1149, with Hampton, 675 F.3d at 731 (Illinois crime of "making insulting or provoking physical contact with a peace officer" is not categorically a violent felony). Nor can we say that the Supreme Court's decision in Johnson constituted an intervening change in law plainly superseding the circuit split, in view of the fact that the circuits have reached differing conclusions even after Johnson. See, e.g., Rozier, 701 F.3d at 682, 685; Dancy, 640 F.3d at 464-67 & n.7; Hampton, 675 F.3d at 731. And, finally, while the Court's decision in Descamps has been material to our decision to apply the categorical approach, Descamps did not address ABPO or a related offense.

In sum, neither the Supreme Court nor this Circuit has yet addressed the particular question before us involving the residual clause of Section 4B1.2(a)(2), and the other circuits that have considered the question remain split on the issue. When "we have yet to speak directly on a legal issue and other circuits are split, a district court does not commit plain error by following the reasoning of another circuit." United States v. Strieper, 666 F.3d 288, 295 (4th Cir. 2012). We therefore conclude that the district court's error was not plain under

these circumstances.[14]   See, e.g., United States v. Wynn, 684 F.3d 473, 480 (4th Cir. 2012) (holding that any error was not plain when "[o]ur [C]ourt has never addressed the [] argument, and the other circuits are split on the issue"); United States v. Abu Ali, 528 F.3d 210, 234 n.8 (4th Cir. 2008) (holding, in the absence of controlling precedent, that the defendant "cannot begin to demonstrate plain error given that a number of our sister circuits" have disagreed with the defendant's position).

III.

For these reasons, we conclude that the district court did not commit plain error in holding that the Virginia ABPO conviction categorically qualified as a crime of violence under the residual clause of Section 4B1.2(a)(2).   Accordingly, we affirm the district court's judgment.

AFFIRMED

---

[14] It is possible for a district court to commit plain error in the absence of controlling authority.  See United States v. Neal, 101 F.3d 993, 998 (4th Cir. 1996) (explaining that, "[i]n the absence of [settled law of the Supreme Court or this Circuit], decisions by other circuit courts of appeals are pertinent to the question of whether an error is plain").  Plain error may arise on occasion when our sister circuits "have uniformly taken a position on an issue that has never been squarely presented to this Court," however, such cases are "exceedingly rare."  United States v. Whab, 355 F.3d 155, 158 (2d Cir. 2004).

27

DAVIS, Circuit Judge, concurring in part and dissenting in part:

My good friend Judge Keenan has written a very fine opinion. I assume her effort does not run afoul of the prohibition on advisory opinions by federal courts. See Preiser v. Newkirk, 422 U.S. 395, 401 (1975) (stating "a federal court has neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them") (internal quotation marks omitted).[1] Accordingly, I

---

[1] We have not ordinarily followed the practice the majority follows here. That is, when we conduct plain error review, we do not purport to announce a "holding" that the district court indeed committed an error but then, at step two of the plain error analysis, decline to find the error plain. Our normal approach is consistent with the principle that we lack "power to . . . decide questions that cannot affect the rights of litigants in the case before [us]." Preiser, 422 U.S. at 401. Rather, we have taken one or more different paths.

Often, we have simply announced, ambiguously, that there was no "plain error" and left it at that, i.e., without separately deciding whether there was error but that the error was not "clear enough" to be plain. See, e.g., United States v. Strieper, 666 F.3d 288, 295 (4th Cir. 2012) ("Because the district court followed the reasoning of the Eighth Circuit regarding an issue on which we have not ruled directly, it did not commit plain error . . . .").

On many other occasions, we have assumed there was error but have relied on Olano step three or step four (see maj. op., ante, at 10) to deny relief. United States v. Jackson, 327 F.3d 273, 304 (4th Cir. 2003) (opinion of the court by Motz and King, JJ., on the relevant issue) ("We, along with several of our sister circuits, have frequently disposed of a plain error issue by analyzing either the third or fourth prong of Olano after assuming, without deciding, that there was an error and that it was plain.") (collecting cases).

(Continued)

On at least one or two other occasions, we have reasoned that there was no error that was "plain", United States v. Wynn, 684 F.3d 473, 480 (4th Cir. 2012) ("It is therefore apparent that the issue has not been resolved plainly."), only to go on to say there was in fact no error at all, id. ("Moreover, on the facts of this case we do not even find error."), or that Olano step three or four was not satisfied, United States v. Johnson, --- F. App'x ---, No. 12-4155, 2013 WL 3069776, at *8 (4th Cir. June 20, 2013) (holding that sentencing error was not plain but further holding that defendant failed to satisfy step three of Olano, stating: "Unfortunately for Johnson, even assuming arguendo that the district court's failure to conclude that USSG § 5G1.3(b) applies to advise the district court that sixteen months of Johnson's 151-month sentence on Count 1 should run concurrent with his Undischarged State Sentence constitutes error that is plain, thus satisfying the first two prongs of Olano's plain error test, Johnson cannot satisfy the third prong.").

A strikingly odd exception to our practice is the pre-Booker case of United States v. Rouse, 362 F.3d 256 (4th Cir. 2004), cert. denied, 543 U.S. 867 (2004). In Rouse, plain error review applied to a district court's failure to impose a concurrent federal sentence; the court imposed instead a departure sentence of ten years to be served consecutively to an active six-year state sentence defendant was then serving. Remarkably, the government conceded that the district court had committed plain error. See Br. of the United States at 8, 2003 WL 25315119 (May 22, 2003) ("[T]he United States concedes that if the defendant's [federal] sentence was erroneously imposed [as a consecutive sentence] and that he was [therefore] erroneously sentenced to serve a longer sentence than the law allows, then the district court committed plain error."). The government contended, however, that in light of the significant "substantial assistance" departure the district court had awarded the defendant, the case should be remanded to allow the district court to reduce the magnitude of the departure in order to achieve the effective sixteen year sentence it intended. Without even mentioning the government's concession or its alternative argument, the Rouse panel agreed with Rouse that the district court had erred but it simply called the error "not plain." 362 F.3d at 264.

No previous or subsequent panel of this Court has employed such reasoning so far as I can discern.

am pleased to join that part of her opinion which adds to the extant circuit split on the issue of whether, under the residual clauses of federal sentencing enhancement provisions, assault and battery on a law enforcement officer is a crime of violence.

I am compelled to dissent, however, from the majority's conclusion that the sentencing error in this case is insufficiently "clear" under existing law, <u>Henderson v. United States</u>, 133 S. Ct. 1121 (2013), such that the error cannot plausibly be held "plain" under Rule 52(b). <u>Ante</u>, at 24-27.

Imagine that our panel had on its docket a second case presenting substantially identical issues as this one on substantially identical facts and procedural history. One option for us would be to hold the second case until we issue our opinion in this case so that we can find the error "plain" in the second case. Such an outcome would be required by <u>Henderson</u>. A second option (i.e., the approach taken by the majority in this case), given the imperative that we be "fair" to each appellant in the two cases (and, I suppose, to the two district judges), would be to issue both opinions simultaneously, thereby declining to find the error plain in either one (because the error would not be "clear" until at least one of the opinions had been filed). A third option would be to find the error "clear" and thus "plain" in both cases, regardless of which one was filed first. I believe, given our current understanding of

the applicable law, as so well laid out by Judge Keenan, the correct option is to find the error plain in both cases.

In his strongly-worded dissent in <u>Henderson</u>, Justice Scalia scolded the majority for its "mistaken understanding that the only purpose of Rule 52(b) is fairness," and insisted that the majority had rendered "the plainness requirement . . . utterly pointless." 133 S. Ct. at 1132-1133. In so arguing, Justice Scalia anticipated the very circumstance we face in this case:

> Consider two defendants in the same circuit who fail to object to an identical error committed by the trial court under unsettled law. By happenstance, Defendant A's appeal is considered first. The court of appeals recognizes that there was error, but denies relief because the law was unclear up to the time of the court of appeals' opinion. Defendant B's appeal is heard later, and he reaps the benefit of the opinion in Defendant A's case settling the law in his favor. What possible purpose is served by distinguishing between these two appellants?

See <u>id.</u> at 1132 (Scalia, J., dissenting). The six-justice majority was not persuaded by Justice Scalia's protestations.

It is clear that, not surprisingly, the dissenters in <u>Henderson</u> were most concerned with issues of finality and wasted judicial resources potentially arising from plenary review of forfeited trial errors, the correction of which might upset convictions and make retrials necessary but problematic:

> Until today, however, the objective of correcting trial-court error has been qualified by the objective of inducing counsel to bring forward claims of error when they can be remedied without overturning a verdict and setting the convicted criminal defendant

31

free. To overlook counsel's failure to object, spend judicial resources to conduct plain-error review, and set aside a criminal conviction where retrial may be difficult if not impossible, is exactly the "'extravagant protection'" that this Court has up until now disavowed.

Id. at 1134 (emphasis removed).

In any event, I think the answer to Justice Scalia's hypothetical, at least regarding errors that result in lengthy illegal sentences, is clear. As only he could, Justice Scalia pooh-poohed the majority's "disbelie[f] that a lawyer would deliberately forgo objection":

> The Court sees no harm in its evisceration of the contemporaneous-objection rule, disbelieving that a lawyer would 'deliberately forgo objection now because he perceives some slightly expanded chance to argue for "plain error" later,' ante, at 1128 – 1129. It is hard to say whether this conclusion springs from a touching faith in the good sportsmanship of criminal defense counsel or an unkind disparagement of their intelligence. Where a criminal case always has been, or has at trial been shown to be, a sure loser with the jury, it makes entire sense to stand silent while the court makes a mistake that may be the basis for undoing the conviction. The happy-happy thought that counsel will not 'deliberately forgo objection' is not a delusion that this Court has hitherto indulged, worrying as it has (in an opinion joined by the author of today's opinion) about '"counsel's "'sandbagging the court"' by 'remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor.'

Id. (citation and emphasis omitted). But the good justice must be forgiven; he's never conducted a sentencing hearing. There is no sandbagging at sentencing, only errors, sometimes by counsel, sometimes by the court, and sometimes, as in this case, by both

32

the court and counsel. See United States v. Escalante-Reyes, 689

F.3d 415 (5th Cir. 2012) (en banc):

> [T]he purpose of plain error review in the first place is so that justice may be done. The contemporaneous objection rule is, in part, intended to prevent lawyers from deliberately withholding an objection in an effort to gain another 'bite at the apple' on appeal in the event that they are unsatisfied with the court's ruling. But the plain error rule recognizes that not all failures to object are strategic. Indeed, some (maybe most) of the time, the failure to object is the product of inadvertence, ignorance, or lack of time to reflect.

Id. at 422 (citations, quotation marks, and footnote omitted).

Appellate courts should not hesitate to remediate failures to object at sentencing when those failures result in the imposition of unlawful sentences and the unlawfulness is sufficiently clear at the time the appeal is decided, regardless of the state of the law up until that time. Henderson unequivocally so holds. See 133 S. Ct. at 1130-31 ("[W]e conclude that whether a legal question was settled or unsettled at the time of trial, it is enough that an error be 'plain' at the time of appellate consideration for [t]he second part of the [four-part] Olano test [to be] satisfied.") (alterations in original) (quotation marks omitted). We should do so here.

Specifically, I have no hesitation in concluding that the error here is "plain" in light of the wisdom revealed by the combination of United States v. Hampton, 675 F.3d 720 (7th Cir. 2012) (holding Illinois offense of assault and battery on a law

33

enforcement officer is not categorically a predicate crime of violence under residual clause), and Rozier v. United States, 701 F.3d 681, 687 (11th Cir. 2012) (Hill, J., dissenting) (same, as to Florida offense of assault and battery on a law enforcement officer), cert. denied, 133 S. Ct. 1740 (2013).[2] Manifestly, as the majority opinion makes perfectly clear, Hampton is the most insightful and well-reasoned of the out-of-circuit cases treating the issue of the impact of a law enforcement victim on the analysis of common law-type assault and battery offenses under a "residual clause" determination.[3]

---

[2] To its credit, the government has not remotely suggested that Olano steps three and four are unsatisfied in this case. There is no doubt that they are satisfied.

[3] Our own circuit precedent consists entirely of unpublished opinions. See United States v. Baker, 326 F. App'x 213 (4th. Cir. April 21, 2009) (unpublished); United States v. Lowe, No. 94-5792, 1995 WL 440410 (4th Cir. July 26, 1995) (unpublished); United States v. Alston, No. 94-5498, 1995 WL 331095 (4th Cir. June 2, 1995) (unpublished). This is telling; none of our colleagues felt the issue was of sufficient import to deserve a precedential determination. As Henderson makes clear, of course, an error arising out of "unsettled law" can be plain in the light of intervening authority. I do not find anything in Henderson to suggest that new authority that "settles" "unsettled" circuit law must come from the Supreme Court itself or from within the circuit. In other words, applying hindsight, as we must under Henderson, I would conclude that we should find the error here, as of today, sufficiently clear that it rises to the level of plain.

34

Judge Keenan's forceful rejection of the government's "powder keg" metaphor is as powerful as it is wise and commonsensical.[4]

---

[4] It bears mention that "assault and battery on a law enforcement officer" is not the proper name or title of Virginia Code § 18.2-57(C), the statute before us. That law, a multi-section statute, has been amended several times since the date of Carthorne's conviction, but it presently provides as follows:

> [I]f any person commits an assault or an assault and battery against another knowing or having reason to know that such other person is a judge, a magistrate, a law-enforcement officer as defined in subsection F, a correctional officer as defined in § 53.1-1, a person directly involved in the case, treatment, or supervision of inmates in the custody of the Department of Corrections or an employee of a local or regional correctional facility directly involved in the care, treatment, or supervision of inmates in the custody of the facility, a person directly involved in the care, treatment, or supervision of persons in the custody of or under the supervision of the Department of Juvenile Justice, an employee or other individual who provides control, care, or treatment of sexually violent predators committed to the custody of the Department of Behavioral Health and Developmental Services, a firefighter as defined in § 65.2-102, or a volunteer firefighter or any emergency medical services personnel member who is employed by or is a volunteer of an emergency medical services agency or as a member of a bona fide volunteer fire department or volunteer emergency medical services agency, regardless of whether a resolution has been adopted by the governing body of a political subdivision recognizing such firefighters or emergency medical services personnel as employees, engaged in the performance of his public duties, such person is guilty of a Class 6 felony and, upon conviction, the sentence of such person shall include a mandatory minimum terms of confinement of six months.

Va. Code § 18.2-57(C). Notably, as well, the definition of "law enforcement officer" under the statute is exceedingly broad: (Continued)

35

Additionally, there is authoritative circuit precedent for finding the error here to be plain. In United States v. Boykin, 669 F.3d 467 (4th Cir. 2012), we found a district court's unpreserved procedural sentencing error to be sufficiently clear to merit the "plain error" label. The circumstances surrounding the district court's misapprehension of a rule of law in that case (circumstances both at the time of the error and at the time of the appeal) were even more opaque than the "crime of violence" determination presented to us in the case at bar.

---

> "Law-enforcement officer" means any full-time or part-time employee of a police department or sheriff's office that is part of or administered by the Commonwealth or any political subdivision thereof who is responsible for the prevention or detection of crime and the enforcement of the penal, traffic or highway laws of the Commonwealth, any conservation officer of the Department of Conservation and Recreation commissioned pursuant to § 10.1-115, any special agent of the Department of Alcoholic Beverage Control, conservation police officers appointed pursuant to § 29.1-200, and full-time sworn members of the enforcement division of the Department of Motor Vehicles appointed pursuant to § 46.2-217, and such officer also includes jail officers in local and regional correctional facilities, all deputy sheriffs, whether assigned to law-enforcement duties, court services or local jail responsibilities, auxiliary police officers appointed or provided for pursuant to §§ 15.2-1731 and 15.2-1733, auxiliary deputy sheriffs appointed pursuant to § 15.2-1603, police officers of the Metropolitan Washington Airports Authority pursuant to § 5.1-158, and fire marshals appointed pursuant to § 27-30 when such fire marshals have police powers as set out in §§ 27-34.2 and 27-34.2:1.

Id. § 18.2-57(F).

36

In <u>Boykin</u>, without objection by the defense to the substantial <u>accuracy</u> of the underlying facts, <u>cf.</u> Fed. R. Crim. P. 32(i)(3)(A) (providing that, at sentencing, the district court "may accept any undisputed portion of the presentence report as a finding of fact"), the district court relied on a presentence report ("PSR") to determine that the defendant had been convicted of two (of the required three) predicate offenses on "separate occasions" as required by the Armed Career Criminal Act. Namely, he had been convicted of the murder of one victim using one firearm, and (moments later) the assault by shooting of another victim using a second firearm. <u>See</u> 669 F.3d at 469. Under rather obscure circuit precedent, <u>viz.</u> <u>United States v. Thompson</u>, 421 F.3d 278 (4th Cir. 2005), which was being interpreted and applied for the first time in a published opinion, and which the district court had actually mentioned at the sentencing hearing (believing it was acting in accordance with it), such reliance was justified only if the information was derived from "<u>Shepard</u>-approved sources." <u>Boykin</u>, 669 F.3d at 469 (citing, in addition to <u>Thompson</u>, <u>Shepard v. United States</u>, 544 U.S. 13 (2005)).

The panel rejected Boykin's argument that review was de novo and accepted the government's contention that plain error review applied. <u>Boykin</u>, 669 F.3d at 469-70. In applying plain error review, the <u>Boykin</u> panel began: "The question is . . .

37

whether the facts detailed in the PSR bear [ ] the earmarks of derivation from Shepard-approved sources." Id. at 471 (brackets in original) (ellipsis added) (quotation marks omitted). The panel did not ask whether the facts were accurate. The panel answered its question by stating, "First, there is no indication in the PSR itself that the information therein came from Shepard-approved sources," id., contrasting that circumstance with those in a case in which the PSR did happen to disclose the source of information. Id. (citing United States v. Vann, 660 F.3d 771, 817 (4th Cir. 2011) (en banc) (Niemeyer, J., dissenting)). Of course, had there been such an indication in the PSR, the issue would not have been presented on appeal in Boykin at all.

The Boykin panel then reasoned, "Second, the factual details of the encounter are not typically found in Shepard-approved sources." Boykin, 669 F.3d at 471. But see Thompson, 421 F.3d at 285.[5]

---

[5] Although Boykin understood Thompson to have relied on a limited collection of documents "bear[ing] the earmarks of derivation from Shepard-approved sources," 669 F.3d at 469 (quoting Thompson), Thompson's actual (and highly ambiguous) recitation of the information on which it held the district court properly relied is far more fulsome:

> The trial judge was entitled to rely upon the PSR because it bears the earmarks of derivation from Shepard-approved sources such as the indictments and state-court judgments from his prior convictions, and,
(Continued)

38

Finally, the Boykin panel reasoned that the record on appeal did not contain any documents that

> could have conceivably revealed the level of detail of the confrontation as recounted in the PSR and accepted by the district court. As such, we simply cannot determine which facts contained in Boykin's PSR related to his prior convictions 'bear[ ] the earmarks of Shepard-approved documents.'

> * * *

> Thus, while it was not error to use the PSR to determine that two crimes had in fact been committed by Boykin--that information is something that would exist in an indictment or other Shepard-approved source--it was error for the district court to use the PSR's factual details of the encounter to apply the ACCA enhancement to Boykin's sentence.

Boykin, 669 F.3d at 471. Of particular relevance to this case, the Boykin panel then concluded that

---

> moreover, Thompson never raised the slightest objection either to the propriety of its source material or to its accuracy. The PSR details three separate state court judgments, entered on different dates, in which Thompson was sentenced for burglarizing a residence. These three judgments encompass seven different counts of felony breaking and entering, taking place on six different days. And even if they had all occurred on the same day, the PSR further reveals that Thompson's court proceedings occurred in two separate jurisdictions (Davidson County and Randolph County) and that the residences he burglarized were owned by seven different people living in three different towns.

421 F.3d at 285. This listing of factual details seems to be captured by the Boykin panel's observation that "factual details . . . are not typically found in Shepard-approved sources." Boykin, 669 F.3d at 471.

39

> [t]he error was also plain. There is nothing in the record to show that the PSR's recounting of the circumstances surrounding the two 1980 convictions exist in Shepard-approved sources. Although some of the information might well appear in such sources, most of it would not, particularly since the sources could not include a plea colloquy or bench findings.

Id. at 471-72. But see United States v. Gillikin, 422 F. App'x 288, 289-90 (4th Cir. 2011) (stating, without elaboration, that "[a]lthough the presentence report did not indicate the source the probation officer relied [on] to conclude that the conviction was a violent felony," the PSR "bears the earmarks of derivation from Shepard-approved sources"). The Boykin panel thus found that a sentencing error by the district court was plain, i.e., clear, even in the face of a rule of criminal procedure that authorized the district court's finding of facts whose basic accuracy was never challenged by the defendant. And it did so even though prior (unpublished) decisions of this Court had excused the absence of validating source identifiers in the information provided by a probation officer in the PSR.

The Boykin panel got plain error review right. See also United States v. Maxwell, 285 F.3d 336 (4th Cir. 2002) (in a case of first impression in the Fourth Circuit, finding a sentencing error "plain" where the existence of error hinged on the interpretation of the word "any" in a federal statute). As the Fifth Circuit has explained:

> [T]he focus of plain error review should be whether the severity of the error's harm demands reversal, and not whether the district court's action . . . deserves rebuke. The plain error rule is protective; it recognizes that in a criminal case, where a defendant's substantial personal rights are at stake, the rule of forfeiture should bend slightly if necessary to prevent a grave injustice.

Escalante-Reyes, 689 F.3d at 423 (citations, quotation marks, and footnote omitted).[6]

The need for a more enlightened conception of plain error review has recently been well articulated. See, e.g., Dustin D. Berger, Moving Toward Law: Refocusing the Federal Courts' Plain Error Doctrine in Criminal Cases, 67 U. Miami L. Rev. 521 (2013). Perhaps Henderson signals a step down the road to enlightenment. But enlightenment is not needed in this case; faithful adherence to existing doctrine would do just fine.

For years now, all over the civilized world, judges, legal experts, social scientists, lawyers, and international human rights and social justice communities have been baffled by the

---

[6] In keeping with its office --substantial justice and fairness--the manifest elasticity of plain error review is made clear by the very cases relied on by the majority in its refusal to find the error here plain. See ante, at 26 n.14 ("It is possible for a district court to commit plain error in the absence of controlling authority." (citing United States v. Neal, 101 F.3d 993, 998 (4th Cir. 1996)). And see id. at 27 ("Plain error may arise on occasion when our sister circuits 'have uniformly taken a position on an issue that has never been squarely presented to this Court.'" (quoting United States v. Whab, 355 F.3d 155, 158 (2d Cir. 2004)). This is one of those "exceedingly rare" instances in which we should do so. Id.

"prison-industrial complex" that the United States has come to maintain. If they want answers to the "how" and the "why" we are so devoted to incarcerating so many for so long, they need only examine this case. Here, a 26-year-old drug-addicted confessed drug dealer, abandoned by his family at a very young age and in and out of juvenile court starting at age 12, has more than fourteen years added to the top of his advisory sentencing guidelines range (387 months rather than 211 months, see ante, maj. op. at 6 & n.3), because, as a misguided and foolish teenager, he spit on a police officer. His potential sentence thus "anchored" and "framed",[7] at the high end, between 17 and 32

---

[7] Cf. United States v. Jones, 762 F. Supp. 2d 270, 284-85 (D. Mass. 2010):

> If downward departure or variance is appropriate in this case—and I believe it is, how far ought the Court depart? This is the most difficult and offender-specific calculus of all. Is it more appropriate to calculate the departure from the bottom of the 232 month guideline range (the so-called "anchoring" to the guidelines principle of which the courts, see e.g., United States v. Docampo, 573 F.3d 1091, 1105 n. 5 (11th Cir. 2009); United States v. Bohanon, 290 F.3d 869, 876 (7th Cir. 2002), and commentators speak, Sarah M.R. Cravens, Judging Discretion: Contexts for Understanding the Role of Judgment, 64 U. Miami L. Rev. 947, 962 (2010); Jelani Jefferson Exum, The More Things Change: A Psychological Case Against Allowing the Federal Sentencing Guidelines to Stay the Same in Light of Gall, Kimbrough, and New Understandings of Reasonableness Review, 58 Cath. U.L. Rev. 115, 125 (2008); Nancy Gertner, What Yogi Berra Teaches About Post-Booker Sentencing, 115 Yale L.J. Pocket Part 127 (2006); Chris Guthrie, Jeffrey J. Rachlinski & Andrew

(Continued)

years, Carthorne may or may not feel fortunate to have received "only" 25 years (300 months) in prison. I do not believe he is "fortunate" at all.

I respectfully dissent from the majority's refusal to find the error in this case "plain."

J. Wistrich, Inside the Judicial Mind, 86 Cornell L. Rev. 777, 787-94 (2001); Kate Stith, The Arc of the Pendulum: Judges, Prosecutors, and the Exercise of Discretion, 117 Yale L.J. 1420, 1496 (2008)? Or will better justice be accomplished by ratcheting up from top of the appropriate non-career offender guideline out of deference to the congressional mandate which gave rise the career offender concept? 28 U.S.C. § 994(h) (mandating that a "career offender" as defined in the statute receive a sentence at or near the maximum term authorized).