**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-4214**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

THOMAS BRADFORD WATERS,

Defendant - Appellant.

Appeal from the United States District Court for the District of South Carolina, at Florence. Bruce H. Hendricks, District Judge. (4:15-cr-00158-BHH-1)

Submitted: March 14, 2017                           Decided: June 21, 2017

Before WILKINSON, KING, and AGEE, Circuit Judges.

Affirmed by unpublished per curiam opinion.

Kathy Price Elmore, ORR ELMORE & ERVIN, LLC, Florence, South Carolina, for Appellant. Beth Drake, Acting United States Attorney, Columbia, South Carolina, Alfred W. Bethea, Jr., Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Florence, South Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Following a jury trial, defendant Thomas Bradford Waters was convicted in the District of South Carolina of being a felon in possession of a firearm, in contravention of 18 U.S.C. § 922(g)(1). Waters appeals his conviction and sentence, presenting two issues. First, he challenges the district court's decision to admit into evidence the oral testimony of witnesses concerning a lost letter in which Waters asked others to falsify a defense for him. Second, Waters argues that the court erred in ruling that a state court conviction in South Carolina for assault with intent to kill is a crime of violence under the Sentencing Guidelines. As explained below, we reject both of those contentions.

I.

A.

1.

On March 17, 2015, the federal authorities filed a criminal complaint and obtained an arrest warrant for Waters, who was apprehended three days later. On March 24, 2015, the grand jury returned an indictment charging Waters with being a felon in possession of a firearm, in contravention of 18 U.S.C. § 922(g)(1). Waters pleaded not guilty and proceeded to trial in Florence on September 14, 2015. The United States Attorney and Waters stipulated that the firearm — a Hi-Point pistol — had travelled in and affected interstate commerce, and that Waters had been previously convicted of a felony offense. Thus, the only issue for the jury was whether Waters had knowingly possessed the firearm.

2

2.

At Waters's trial, the prosecution called only four witnesses: John Stewart, an investigator in the narcotics division of the Lake City, South Carolina, Police Department; Mark Strickland, a corporal with the Lake City PD; Judy Gore, the mother of Waters's girlfriend; and Joseph Brown, a man who had dated the sister of Waters's girlfriend.[1] We summarize the facts revealed by the evidence.

On the evening of March 12, 2015, an anonymous tipster called the Lake City PD to report a fight at the Wedgefield Trailer Park in Lake City. The tipster related that the suspect — who was armed with a handgun — had "no shirt, [a] husky build, [and] short dreads," and had assaulted a person wearing a red shirt. *See* J.A. 53.[2] The suspect's lack of a shirt was noteworthy because it was a cold evening. Investigator Stewart accompanied other patrol units, including that of Cpl. Strickland, in responding to the call. While the police officers were en route to Wedgefield, police dispatch reported that the suspect was walking toward Coker Trailer Park, which adjoined Wedgefield.

When Stewart and Strickland arrived at the Coker Park, they saw a man — who turned out to be Waters — fitting the description provided by the tipster. Officer Stewart flashed a light on Waters, at which point Stewart "immediately saw something bulging out

---

[1] The facts related herein are drawn from the evidence at trial. They are recited in the light most favorable to the prosecution. *See United States v. Smith*, 451 F.3d 209, 217 (4th Cir. 2006).

[2] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

3

of [Waters's] right back pocket that appeared to be the handle of a gun." *See* J.A. 54. Stewart promptly drew his service weapon and ordered Waters "several times" to get down on the ground. *Id.* at 55. Waters refused to comply, however, and Stewart then "got behind [Waters] to try to cuff him up." *Id.* A struggle ensued, and Waters knocked Stewart's hand away. When Strickland saw Waters reach for his back pocket — where Stewart had previously seen what he thought to be the handgun — he tased Waters. Waters fell to the ground, and Stewart retrieved the handgun from Waters's pocket and threw it aside. Stewart had only partially handcuffed Waters's hands when his taser lead broke. Stewart eventually completed the handcuffing of Waters.

Stewart then attempted to place Waters in the police vehicle. At that point, Waters "fell in the vehicle head first and began kicking." *See* J.A. 61. Stewart, however, eventually secured Waters in the police car. Stewart then retrieved Waters's handgun from the ground and gave it to Cpl. Strickland. The Hi-Point pistol was promptly identified as having been stolen in Darlington County, South Carolina. Stewart then transported Waters to the police department and walked him into the booking area. While Strickland was completing his booking paperwork, Waters "said he would just tell the police that the other guy had the gun or he would just tell the jury that the other guy had the gun and dropped it and he picked it up." *Id.* at 63.

At the time of these events, Waters lived in Coker Trailer Park with his girlfriend — the mother of his children — Latefa Gore. Following Waters's arrest, Judy Gore, who was Latefa's mother, went to Latefa's home to help with the children. When Judy Gore arrived to babysit, "the house was in disarray." *See* J.A. 104. Judy "decided to go ahead

4

and clean up" so that she could cook the children some food.  *Id.*  While cleaning up, Judy came across a letter addressed to Latefa "that was handwritten on a plain piece of paper in pencil."  *Id.*  The unsigned letter directed Latefa to contact Waters's sister Shadrika, and Do-Lot, Waters's brother.  Judy Gore concluded that Waters had written the letter, which advised Latefa, Shadrika, and Do-Lot what they should say to the authorities about Waters's arrest.  According to Judy, the letter related that those three persons were to "[t]ell [Waters's] lawyer and the police" the following:

- "that when the — when they had — when he had the fight with the person that he had the fight with that he did not have a gun";

- that "while they were fighting, they did not know that the police was coming until the police had arrived"; and

-  that "when the police got there, that's when they looked and saw the gun beside him."

*Id.* at 106.  The letter reiterated that Waters needed Latefa, Shadrika, and Do-Lot "to tell the same exact story."  *Id.*  Judy Gore understood that the account of Waters's arrest as related in the handwritten letter "was not the story that was out in the street."  *Id.* at 107.  In other words, Judy believed that Waters was asking her daughter, as well as his siblings, to create a false defense for him.  Judy did not mention the letter to Latefa.  Instead, after Latefa left for work, Judy folded up the letter, placed it in her pocketbook, and took it to the home of her older daughter Lacrese.  Judy Gore never saw the letter again.

Joseph Brown, Lacrese's boyfriend, lived with Lacrese.  Brown soon discovered and read the letter that Judy Gore had carried to the house where he and Lacrese lived.  Like Judy Gore, Brown recalled from reading the letter that it requested Latefa, Shadrika,

5

and others to testify "that the police tased [Waters] for nothing and planted the gun on him." *See* J.A. 122-23. Brown knew that Waters had written the letter because of the distinctive handwriting pattern. Specifically, Brown believed Waters to be the author of the letter

> [b]ecause he was — he's the only one I knew that would take all the C's —
> all the B's out and put the C's in the B's spot

*Id.* at 122. Brown "laughed at" the letter, which "didn't make sense" to him. *Id.* at 123-24. At the trial, Brown believed the letter to be lost because he hadn't seen it since he first found it in his home.

### 3.

Waters objected to Judy Gore's and Brown's anticipated testimony about the lost letter on three grounds. First, Waters argued that the letter was unauthenticated. Second, he contended that testimony about the letter from the various witnesses would violate the best evidence rule. Finally, Waters asserted that any testimony about the letter would simply be impermissible hearsay. The district court overruled each of those objections and admitted the testimonial evidence of Judy Gore and Brown concerning the lost letter. The prosecution rested on September 14, 2015, and the jury returned a verdict of guilty later that day.

### B.

On April 13, 2016, the district court conducted the sentencing hearing. The presentence report (the "PSR") concluded that Waters's base offense level was 20, in that he had committed the offense of conviction after a felony conviction for a crime of violence

6

— assault with intent to kill under South Carolina law. The PSR recommended three enhancements: a two-level enhancement for a stolen weapon; a four-level enhancement for using a firearm in connection with another felony offense; and a two-level enhancement for obstruction of justice. These enhancements resulted in a total offense level of 28. When combined with Waters's criminal history category of IV, that offense level resulted in a Guidelines range of 110 to 137 months. Because the statutory maximum term for the offense of conviction was 120 months, *see* 18 U.S.C. § 924(a)(2), the applicable Guidelines range was 110 to 120 months in prison.

Waters objected to the PSR, contending that his South Carolina conviction for assault with intent to kill was not a crime of violence under section 4B1.2(a) of the Guidelines.[3] In his appeal brief, Waters assumed that the Supreme Court's 2015 decision in *Johnson v. United States* had undermined the residual clause of section 4B1.2(a). *See* 135 S. Ct. 2551 (2015). He therefore argued that his conviction for assault with intent to kill was not a crime of violence under the first prong of section 4B1.2(a) — that is, the force clause — because his state conviction did not require any violent force. The court

---

[3] Waters also objected to the four-level enhancement recommended in the PSR, maintaining that it was not warranted because he had not possessed the firearm in connection with another felony offense. The district court overruled this objection and applied the four-level enhancement, a decision Waters did not initially challenge on appeal. In a subsequent pro se submission in this appeal, Waters now contends that this enhancement is inapplicable because the other felony offense with which he was charged — a state court offense of assault on a police officer while resisting arrest — was dismissed. This contention is unpersuasive. The four-level enhancement applies "regardless of whether a criminal charge was brought, or a conviction obtained." *See* USSG § 2K2.1, cmt. n.14(C).

overruled this objection also, ruling that Waters's state conviction was a crime of violence under the force clause of section 4B1.2(a) because it required the intent to commit serious bodily injury. The court then adopted the Guidelines calculation proposed in the PSR and sentenced Waters to a term of 120 months in prison.

Waters has timely noted this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We review for abuse of discretion a trial court's decision concerning the admissibility of evidence. *See United States v. Fulks*, 454 F.3d 410, 434 (4th Cir. 2006). We review de novo the question of whether a prior conviction of the defendant constitutes a crime of violence. *See United States v. McNeal*, 818 F.3d 141, 151 (4th Cir. 2016).

## III.

On appeal, Waters presents two contentions of error. First, he maintains that the district court erred in permitting Judy Gore and Joseph Brown to testify about the contents of the lost letter. Second, he challenges the court's ruling that his South Carolina conviction for assault with intent to kill constitutes a crime of violence.

### A.

We first assess Waters's contention that the district court erroneously admitted testimonial evidence concerning the lost letter. Waters maintains that Judy Gore's and Brown's testimony relating to the lost letter is inadmissible because the letter is

unauthenticated, contravenes the best evidence rule, and is inadmissible hearsay. We address those arguments in turn.

1.

First, Waters contends that the testimony of Judy Gore and Brown concerning the contents of the lost letter written by Waters is inadmissible because their testimony in that regard was never authenticated. Although the proponent of evidence must lay a sufficient foundation to authenticate it, that burden is not high. *See United States v. Hassan*, 742 F.3d 104, 133 (4th Cir. 2014). Indeed, to "establish that evidence is authentic, the proponent need only present evidence sufficient to support a finding that the matter in question is what the proponent claims." *Id.* (internal quotation marks omitted). "Because the district court has first-hand knowledge of the trial proceedings, we have consistently held that the district court should be afforded wide discretion . . . and that the district court's evidentiary determinations should not be overturned except under the most extraordinary of circumstances." *See United States v. Aramony*, 88 F.3d 1369, 1377 (4th Cir. 1996) (internal quotation marks omitted). As we have previously recognized, "expert opinion on handwriting is not necessary." *See United States v. Dozie*, 27 F.3d 95, 98 (4th Cir. 1994). Furthermore, "[a]n original is not required and other evidence of the content of a writing . . . is admissible if all the originals are lost." *See* Fed. R. Evid. 1004(a). For example, the "testimony of a witness with knowledge" can serve to authenticate evidence that has been lost. *Id.* 901(b)(1).

Two witnesses — Judy Gore and Joseph Brown — saw and read the lost letter and were able to testify at trial to its contents. Both of those witnesses confirmed that Waters

had authored the letter. Judy Gore was convinced that Waters had authored the letter because it was addressed to her daughter Latefa, who was Waters's girlfriend, and because Judy found the letter in Latefa's home. Judy's opinion that Waters authored the letter was supported by the fact that it asked Latefa to contact Waters's sister, Shadrika, and included her cell phone number. Brown also testified that Waters wrote the letter and explained that Waters was the only person Brown knew who always took the letter "B" out of his writing and replaced it with the letter "C." Judy Gore and Brown believed that the letter solicited false testimony from Waters's girlfriend, his brother, and his sister. The prosecution thus made a sufficient showing to satisfy its burden of authenticating the testimonial evidence concerning the lost letter. *See Hassan*, 742 F.3d at 133.

2.

Second, Waters contends that the testimony of both Judy Gore and Brown concerning the contents of the lost letter contravenes the best evidence rule. That rule — spelled out in Rule 1002 of the Federal Rules of Evidence — provides as follows:

> An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise.

*See* Fed. R. Evid. 1002. Rule 1004(a) creates an exception to the best evidence rule for lost evidence, and provides that:

> [A]n original is not required and other evidence of the content of a writing . . . is admissible if all the originals are lost or destroyed, and not by the proponent acting in bad faith.

*See* Fed. R. Evid. 1004(a).

10

Although the prosecution would typically be required to produce the original of a letter in order for its contents to be admissible, the original is not required in this case because the letter was confirmed as lost through no act of bad faith on the part of the prosecution (i.e., the proponent of the evidence). *See* Fed. R. Evid. 1004(a). At trial, the prosecution produced ample testimony to prove that Waters had authored the letter, and that it was lost. Accordingly, the trial court did not abuse its discretion in admitting testimonial evidence concerning the contents of the lost letter.

3.

Third, Waters contends that any testimony about the contents of the lost letter was inadmissible hearsay. In our view, however, the contents of the lost letter were admissible as admissions by a party opponent, which are excluded from the definition of hearsay. *See* Fed. R. Evid. 801(d)(2)(A) (excluding from the definition of hearsay a statement offered against an opposing party that "was made by the party in an individual or representative capacity"). In *United States v. Wills*, 346 F.3d 476, 489-90 (4th Cir. 2003), we ruled that a defendant's own statements constitute admissions by a party opponent and are admissible pursuant to Rule 801(d)(2)(A). Furthermore, a letter "qualifies as an admission and is thus not hearsay." *See United States v. Shorter*, 54 F.3d 1248, 1260 (7th Cir. 1995).

Because Waters was shown to have written the lost letter, the contents of the letter are Waters's own statements. The letter "qualifies as an admission," and the evidence of the lost letter written by Waters was thus an admission by a party opponent. *See Shorter*, 54 F.3d at 1260. As such, it was properly admitted pursuant to Rule 801(d)(2)(A). The district court therefore did not err in overruling Waters's hearsay objection.

11

B.

In his second contention on appeal, Waters argues that the district court erred in ruling that his South Carolina conviction for assault with intent to kill is a crime of violence. Waters's argument is foreclosed, however, by the Supreme Court's recent decision in *Beckles v. United States*, which was rendered by the Court after briefing had been completed in this appeal. *See* 137 S. Ct. 886 (2017). We will briefly describe the relevant Guidelines provisions before delving into the *Beckles* decision and South Carolina law.

In this case, Waters was convicted of being a felon in possession of a firearm, in violation of § 922(g)(1), which corresponds to section 2K2.1 of the Guidelines. Section 2K2.1(a)(4)(A) provides for a base offense level of 20 if

> the defendant committed any part of the instant offense subsequent to sustaining one felony conviction of either a crime of violence or a controlled substance offense.

*See* USSG § 2K2.1(a)(4)(A). The term "crime of violence" is defined in section 4B1.2(a) of the Guidelines and in Application Note 1 thereof. *Id.* cmt. n.1. Section 4B1.2(a) provides as follows:

> (a) The term "crime of violence" means any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that —
>
> > (1) has as an element the use, attempted use, or threatened use of physical force against the person of another [the "force clause"], or
> >
> > (2) is burglary of a dwelling, arson, or extortion, involves use of explosives [the "enumerated offenses"], or otherwise involves conduct that presents a serious potential risk of physical injury to another [the "residual clause"].

12

*See* USSG § 4B1.2(a). In the district court and on appeal, Waters has based his sentencing contentions on the force clause, assuming that the Supreme Court's 2015 decision in *Johnson* eviscerated the residual clause of section 4B1.2(a). Indeed, the district court also predicated its ruling at sentencing on the force clause. In *Johnson*, the Court ruled that the residual clause of the Armed Career Criminal Act (the "ACCA") was void under the Due Process Clause of the Fifth Amendment because "the indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges." *See* 135 S. Ct. at 2557. Post-*Johnson*, several of the federal courts ruled — and many litigants assumed — that the almost identical language of the residual clause in section 4B1.2(a) was also constitutionally defective. *See, e.g.*, *United States v. Hurlburt*, 835 F.3d 715, 725 (7th Cir. 2016) (en banc) (ruling that *Johnson* had invalidated as unconstitutional the residual clause in section 4B1.2(a)), *abrogated by Beckles*, 137 S. Ct. at 903.

Just three months ago, in *Beckles*, the Supreme Court ruled that the Guidelines — including the residual clause of section 4B1.2(a) — are not subject to a vagueness challenge under the Due Process Clause. *See* 137 S. Ct. at 890. The Court declined to extend *Johnson* to the Guidelines, explaining that — unlike the statutory provision at issue in *Johnson* — the Guidelines "do not fix the permissible range of sentences." *Id.* at 892. Rather, the Guidelines "merely guide the exercise of a court's discretion in choosing an appropriate sentence within the statutory range." *Id.* The Guidelines, as the Court explicitly ruled, "are not subject to a vagueness challenge under the Due Process Clause." *Id.*

13

The district court — without the benefit of the Court's ruling in *Beckles* — assumed that *Johnson* had invalidated the residual clause of section 4B1.2(a) and did not rely on it in Waters's sentencing. That procedure — as we now know from *Beckles* — was incorrect. On appeal, therefore, we can look to the residual clause of section 4B1.2(a) in assessing whether Waters's prior conviction is a crime of violence. *See United States v. Brown*, 701 F.3d 120, 125 (4th Cir. 2012) (stating that "our inquiry is not limited to the district court's reasoning, and we are entitled to . . . affirm on any ground supported by the record" (internal quotation marks omitted)). Assessing the issue under the residual clause, it is clear that the South Carolina offense of assault with intent to kill constitutes a crime of violence.

We apply a categorical approach to "examine the fact of conviction and the statutory definition of the prior offense" when determining a crime of violence question. *See United States v. Carthorne*, 726 F.3d 503, 511 (4th Cir. 2013) (internal quotation marks omitted). Pursuant thereto, we decide "whether the elements of the offense are of the type that would justify its inclusion within the residual clause, without inquiring into the specific conduct of this particular offender." *Id.* (alteration and internal quotation marks omitted). In South Carolina, the offense of assault with intent to kill encompasses those situations where a person possesses an intent to kill but did not actually commit a battery, such as discharging a firearm at an intended victim but missing him. Waters's underlying state crime, the South Carolina offense of assault with intent to kill, has five elements: (1) an unlawful attempt; (2) to commit a violent injury; (3) to the person of another; (4) with malicious intent; and

14

(5) accompanied by the present ability to complete the act. *See State v. Burton*, 589 S.E.2d 6, 8 (S.C. 2003).

Although we have never ruled on whether that South Carolina offense is a crime of violence, we have rendered an unpublished decision regarding a Maryland assault with intent to murder that is persuasive. In *United States v. Battle*, we explained that the Maryland offense of assault with intent to murder qualifies as a "violent felony" — under the residual clause of the ACCA — because it involves a substantial potential risk of physical injury to the victim. *See* 494 F. App'x 404, 406 (4th Cir. 2012).[4] Assault with intent to murder in Maryland requires an assault — an "attempted battery or the intentional placing of a victim in reasonable apprehension of an imminent battery" — paired with a specific intent to kill. *Id.* at 405. In *Battle*, we quoted with approval the district court's ruling that "the perpetrator [of a Maryland assault with intent to murder], by definition, must intend to kill or at least seriously injure the victim and must assault the victim with that intention." *Id.* at 406. As a result, we identified no error in the court's ruling that a Maryland assault with intent to murder qualifies as an ACCA violent felony. *Id.* at 406-07.

Similar to the issue of the Maryland assault with intent to murder offense that we discussed in *Battle*, a South Carolina assault with intent to kill requires an attempt to

---

[4] Our precedent evaluating the ACCA applies with equal force to the Sentencing Guidelines. *See United States v. Jarmon*, 596 F.3d 228, 231 n* (4th Cir. 2010) (explaining that, because the definition of a "violent felony" in the ACCA is substantively identical to the definition of a "crime of violence" in section 4B1.2(a), "precedents evaluating the ACCA apply with equal force" to section 4B1.2(a)).

violently injure another person with the general intent to kill. *Cf. State v. Wilds*, 584 S.E.2d 138, 141 (S.C. Ct. App. 2003); *see also Definition of Assault with Intent to Kill — Generally*, 3 S.C. Jur. Assault & Battery § 20, Westlaw (database updated June 2017). In these circumstances, we are entirely satisfied that the South Carolina offense of assault with intent to kill is a "crime of violence" under the residual clause of section 4B1.2(a).

## IV.

Pursuant to the foregoing, we affirm the judgment of the district court.

*AFFIRMED*